Darrell Wayne SHERIDAN *v.* STATE of Arkansas

CR 90-295 852 S.W.2d 772

Supreme Court of Arkansas
Opinion delivered May 3, 1993

*John Wesley Hall, Jr., P.A.*, by: *John Wesley Hall, Jr.* and *Craig Lambert*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. This is an appeal from Darrell Wayne Sheridan's conviction for capital murder. After a jury trial, Sheridan was found guilty and sentenced to the death penalty for the premeditated murder of Laurie Ann Brown.

Darrell Wayne Sheridan and Laurie Ann Brown had formerly lived together in Little Rock. Darrell's brother, Robert Sheridan, lived with Laurie Ann's sister, Cherie Brown, for several years.

On February 9, 1990, Laurie Ann told Ray Bollen that she

had informed the Sherwood Police that Darrell and his new wife, Connie, were involved in drug dealing. As a result, Ray Bollen went to Robert Sheridan's house in Benton, and the two went to Darrell's residence, where they told Darrell about Laurie Ann's statements.

The next day, February 10, 1990, Darrell and Connie went to Benton, in his words, to "scare" Laurie Ann. They went to Robert's house and asked him to show them where Laurie Ann lived. Robert willingly accompanied them and knocked on the door while Darrell stood behind. Darrell entered Laurie Ann's house and spoke with Mike Coker, Laurie Ann's boyfriend, and accused him of informing on them. Laurie Ann first hid in a bedroom but later came out, and she and Mike Coker got into the Sheridans' car to go and "talk."

They decided to go to Robert's house to talk because this was "neutral" territory, but when they reached the street to turn toward his house, Darrell told his wife Connie, who was driving, to drive straight and go to the China Grove Cemetery. Connie drove there and backed into the road leading to the cemetery. Darrell got out of the car and told Laurie Ann to get out of the car. He told his brother to hold her so she could not run away, but this proved unnecessary. Mike Coker testified that he saw a knife in Darrell's hand after he exited the car. Darrell Sheridan then told the passengers of the car, "Give me ten minutes." Then, Robert Sheridan, Connie Sheridan, and Mike Coker drove off.

After driving a short distance, Mike Coker asked to be let out of the car. Robert gave him his coat and let him go. Mike Coker walked to the nearest store, but there was no phone to call for help. He hitchhiked back to the house where he got into a truck and drove to Cherie Brown and Robert Sheridan's house.

After Connie and Robert returned to the cemetery in the car, Darrell asked her to open the trunk, where he put his shirt. Connie, Robert, and Darrell then went to Mike Magby's house, where Darrell asked Robert to get him another shirt. Inside Mike Magby's house, Darrell took a knife and cut his thumb and smeared his own blood on his pants. As Robert was getting in his truck to leave, Darrell Sheridan said to him, "If you have any trouble with Coker, tell him you'll get him." Robert replied, "No, I won't do that, I won't have to." Darrell then said, "Well, just tell

him I will."

Robert returned to his own house but would not tell Cherie where her sister was. Immediately after this, Mike Coker reached Cherie's house, and Cherie and Mike then went out to the cemetery. After a short search, they found Laurie Ann Brown stabbed to death on the road to the cemetery. Laurie Ann received multiple injuries including stab wounds to her neck, face, forehead, jaw, right upper chest, arm, and back. Both hands had multiple defensive stab wounds. Laurie Ann was approximately six months pregnant with Mike Coker's child.

Later that night, Darrell and Connie took Darrell's clothes to the Arkansas River where they burned them.

There was conflicting evidence regarding the knife which was the actual murder weapon. Testimony at trial revealed that a large hunting knife was stuck into the wood frame over the inside front door of Laurie Ann's house and that, upon entering the house, Connie took this knife down. However, Darrell testified that he took this knife away from Connie and threw it down on a couch inside the house.

Another knife came up when Cherie Brown testified that Darrell "flashed" a knife at her at Robert Sheridan's apartment upon first arriving in Benton the night of the murder when Darrell alluded to killing Mike Guynn. Darrell positively identified this knife at trial as the same knife he had shown Cherie the night of the murder and as the same knife he gave the police through his attorney after his arrest, although this knife was not positively linked to the crime by police testing. Also, although Darrell stated that he did not have a knife with him, Mike Coker testified that he saw Darrell with a knife in his hand when he got out of the car with Laurie Ann at the China Grove Cemetery.

Finally, when questioned about where the murder weapon came from, Darrell testified that Laurie Ann brought her own knife to the cemetery which she hid on her person. It was her knife which Darrell said slit her throat. Although it was never recovered by a police search, Darrell testified that he threw this knife into the woods after the killing.

The day after the murder, Darrell and Connie Sheridan met with an attorney, C.P. Christian, who arranged for them to turn

themselves in. At the police station, Connie gave her statement first with Mr. Christian present. After hearing her statement, Mr. Christian opted to represent Connie and declined to represent Darrell.

After trial, a jury found the appellant, Darrell Sheridan, guilty of capital murder under Ark. Code Ann. § 5-10-101(a)(4) (Supp. 1991), which defines capital murder as murder committed "[w]ith the premeditated and deliberated purpose of causing the death of another person." At sentencing, the jury found the aggravating circumstance existed which justified the death penalty because Darrell Sheridan committed the murder "for the purpose of avoiding or preventing an arrest or effecting an escape from custody," the statutory aggravating circumstance at Ark. Code Ann. § 5-4-604(5) (1987).

Darrell, Robert, and Connie Sheridan were originally all charged with capital murder. In exchange for his testimony, Robert pled guilty to hindering the apprehension of a criminal. The record before us is silent as to what happened to Connie.

## I. SUFFICIENCY OF THE EVIDENCE

Sheridan moved for a directed verdict at the close of the State's evidence and again at the close of the case, thus preserving for appeal the issue of sufficiency of the evidence. *Tisdale* v. *State*, 311 Ark. 220, 843 S.W.2d 803 (1992); *Sanders* v. *State*, 308 Ark. 178, 824 S.W.2d 353 (1992).

On appeal, the appellate court does not weigh evidence on one side against the other; it simply determines whether the evidence in support of the verdict is substantial. *Brown* v. *State*, 309 Ark. 503, 832 S.W.2d 477 (1992); *Black* v. *State*, 306 Ark. 394, 814 S.W.2d 905 (1991). Substantial evidence is that which is forceful enough to compel reasonable minds to reach a conclusion one way or another. *Lukach* v. *State*, 310 Ark. 38, 834 S.W.2d 642 (1992); *Smith* v. *State*, 308 Ark. 390, 824 S.W.2d 838 (1992); *Williams* v. *State*, 304 Ark. 509, 804 S.W.2d 346 (1991). Circumstantial evidence may constitute substantial evidence. *Hill* v. *State*, 299 Ark. 327, 773 S.W.2d 424 (1989). To be sufficient to sustain a conviction, the circumstantial evidence must exclude every other reasonable hypothesis consistent with innocence. *Bennett* v. *State*, 308 Ark. 393, 825 S.W.2d 560

(1992). This becomes a question for the fact finder to determine. *Id.* In determining whether there was substantial evidence, the court reviews the evidence in the light most favorable to the appellee. *Pope* v. *State*, 262 Ark. 476, S.W.2d 887 (1977). Guilt may be proved, even in the absence of eyewitness testimony, and evidence of guilt is no less because it is circumstantial. *Smith* v. *State*, 282 Ark. 535, 669 S.W.2d 201 (1984). *See also Standridge* v. *State*, 310 Ark. 408, 837 S.W.2d 447 (1992); *Abdullah* v. *State*, 301 Ark. 235, 783 S.W.2d 58 (1990).

Sheridan's first point of error is that there was insufficient evidence of the aggravating circumstance which the jury found justified the death penalty, i.e., that "the capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody," to support the death penalty. We disagree and find the evidence was overwhelming that Darrell Sheridan killed Laurie Ann Brown because she had informed narcotics agents that he was involved in drugs.

Some of this evidence includes:

(1) Laura Gill, Laurie Ann Brown's coworker, testified that Sheridan came to their workplace six months before the murder, and Laurie Ann told her he was "out to get her."

(2) One month before Laurie Ann's death, Darrell and Connie returned to her workplace and pointed a gun at Laurie Ann and threatened her.

(3) The day before the murder, Laurie Ann told Ray Bollen she had informed on Sheridan. As a result, Robert Sheridan testified that Ray Bollen came over and asked him to take him to Darrell's house in Little Rock. Once there, Robert stated that Ray Bollen and his brother talked in the other room and then Darrell came back in and asked Robert if he would take them to Laurie Ann's house.

(4) The next day, Darrell, Connie, and Robert Sheridan went to Laurie Ann's home and demanded that Mike Coker and Ms. Brown accompany them. Testimony revealed that Darrell Sheridan said he was taking Laurie Ann to a "black hole."

(5) In the car, Darrell asked Laurie Ann to "tell me what you've done," and he said she had "snitched on him."

(6) After Darrell and Laurie Ann got out of the car at the China Grove Cemetery, Connie Sheridan said to Mike Coker, "What else can happen? Don't know what else to do."

(7) After leaving the cemetery, Darrell told Robert to threaten Mike Coker to not reveal what had happened that night.

(8) A Sherwood Police Department investigator, Charles Gassoway, testified that he received an anonymous phone call from a female informant who stated that Darrell and Connie were involved in the trafficking of crystal methamphetamine. A phone bill documenting the call was introduced.

(9) A local newspaper was received into evidence with Laurie Ann's handwriting which stated Charles Gassoway's name.

(10) Patricia Brown, Laurie Ann's mother testified that Laurie Ann had called the police regarding Darrell and Connie.

Sheridan further argues that this statutory aggravating circumstance is inapplicable here because Laurie Ann's murder was carried out to punish her and not carried out to "prevent an arrest," since Ms. Brown had already called the police and thus the police could have arrested the Sheridans. Regardless of the timing, Laurie Ann could have been a witness against the Sheridans, and we have held that killing a victim to eliminate a witness is the same thing as avoiding or preventing a lawful arrest. *Miller* v. *State*, 269 Ark. 341, 605 S.W.2d 430 (1980).

## II. CONSTITUTIONAL ARGUMENTS

### A. MANDATORY NARROWING FUNCTION AND OVERLAP OF OFFENSES

Sheridan next argues that the capital murder statute is unconstitutional under the Eighth and Fourteenth Amendments for two reasons: (1) the statute does not satisfy the mandatory narrowing function and, (2) because there is no difference in "premeditation and deliberation" and "purposely", the capital murder statute and the first degree murder statutes impermissibly overlap.

We most recently rejected both arguments in *Ward* v. *State*, 308 Ark. 415, 418-9, 827 S.W.2d 110, 111-2 (1992):

Appellant's initial argument raises two challenges to the constitutionality of the capital murder statute, Ark. Code Ann. § 5-10-101 (Supp. 1991). As we have previously addressed appellant's constitutional arguments, our discussion will be brief. First, appellant argues that the homicide statutes' 1989 revisions, which upgraded "premeditated and deliberated" murder from first-degree murder to capital murder, violate the constitutional prohibition against sentencing guidelines that fail to sufficiently narrow jury discretion in death penalty cases.

Under Ark. Code Ann. § 5-4-604 (Supp. 1991), the death penalty may not be imposed unless the state can prove the existence of an "aggravating circumstance." In *O'Rourke v. State*, 295 Ark. 57, 746 S.W.2d 52 (1988), we emphasized the following language from the Supreme Court's decision in *Lowenfield* v. *Phelps*, 484 U.S. 231 (1988), where the Supreme Court explained that, in order to genuinely narrow the class of persons eligible for the death penalty, a state may choose between two capital sentencing schemes:

> The legislature may itself narrow the definition of capital offenses, . . . so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase.

*O'Rourke, supra*, at 64, 56 (quoting *Lowenfield, supra*, at 246).

Under Arkansas' revised capital sentencing scheme, the constitutionally-required narrowing function is provided by the "aggravating circumstance" requirement at the penalty phase. Since appellant would not have been eligible for the death penalty in the absence of any aggravating circumstance, we find that the sentencing scheme passes constitutional muster.

Appellant's second constitutional challenge is that the elements of "premeditated and deliberated" capital murder, § 5-10-101(a)(4), and the elements of "purposeful"

first-degree murder, Ark. Code Ann. § 5-10-102(a)(2) (Supp. 1991), impermissibly overlap. We have previously rejected this argument based on the same rationale we have used to uphold capital felony murder and first degree felony murder. *Smith* v. *State*, 306 Ark. 483, 815 S.W.2d 922 (1991). As long as there is no impermissible uncertainty in the definitions of these offenses, the mere existence of any overlapping does not render a statute constitutionally infirm. *Sellers* v. *State*, 300 Ark. 280, 778 S.W.2d 603 (1989); *White* v. *State*, 298 Ark. 55, 764 S.W.2d 613 (1989); *Cromwell* v. *State*, 269 Ark. 104, 598 S.W.2d 733 (1980).

*See also McArthur* v. *State*, 309 Ark. 196, 830 S.W.2d 842 (1992); *Hill* v. *State*, 303 Ark. 462, 798 S.W.2d 65 (1990).

## B. JURY'S ABILITY TO SHOW MERCY UNDER THE SENTENCING PROVISIONS OF THE ARKANSAS DEATH PENALTY STATUTE

Sheridan's third argument is that our statutory scheme results in a mandatory death sentence such that the jury can show no mercy.

We rejected this argument most recently in *Johnson* v. *State*, 308 Ark. 7, 17-18, 823 S.W.2d 800, 806 (1992), *cert. denied*, 112 S. Ct. 3043 (1992):

The appellant next argues that "the Arkansas capital murder statutory scheme becomes a mandatory death statute, and as such, is unconstitutional because it does not allow the jury to show mercy to a particular defendant." We most recently rejected this argument in *Hill* v. *State*, 289 Ark. 387, 713 S.W.2d 233 (1986). There, quoting from *Clines, Holmes, Richley & Orndorff* v. *State*, 280 Ark. 77, 82, 656 S.W.2d 684, 686 (1983), we wrote: "[W]hatever the jury may find with respect to aggravation versus mitigation, it is still free to return a verdict of life without parole, simply by finding that the aggravating circumstances do not justify a sentence of death."

## C. AMCI FORM 2

Sheridan next argues that the court erred in denying his request to submit his version of Form 2 of the AMCI on mitigating circumstances that added eleven potential mitigating circumstances. The court instead submitted the standard instruction. He claims that this violated his Eighth and Fourteenth Amendment rights but fails to tell us how.

Sheridan's offered verdict form reads as follows:

A.( ) We unanimously find that the following mitigating circumstances probably existed at the time of the murder:

( ) The Capital Murder was committed while Darrell Wayne Sheridan was under extreme mental or emotional disturbance.

( ) Darrell Wayne Sheridan has no significant history of prior criminal activity.

( ) Darrell Wayne Sheridan has a good work record.

( ) Darrell Wayne Sheridan was a good family person.

( ) Darrell Wayne Sheridan has shown remorse for the crime.

( ) Darrell Wayne Sheridan cooperated with the police in that he surrendered to the police when he learned that he was wanted.

( ) Darrell Wayne Sheridan has good character but for this criminal act.

( ) Darrell Wayne Sheridan's act had stressful events underlying it.

( ) Darrell Wayne Sheridan has a good record of conduct while in jail.

( ) Darrell Wayne Sheridan has engaged in religious activities while in jail.

( ) Darrell Wayne Sheridan acted impulsively at the time of the crime.

( ) The members of the jury, while having found Darrell

Wayne Sheridan guilty by a reasonable doubt, still have some possible doubt as to guilt for the crime of capital murder.

Other:( ) specify in writing _____

· B.( ) One or more members of the jury believed that the following mitigating circumstances probable existed, but the jury did not unanimously agree:

[repeat the same eleven factors]

C.( ) There was evidence of the following mitigating circumstances, but the jury unanimously agreed that they did not exist at the time of the murder:

[repeat the same eleven factors]

D.( ) There was no evidence of any mitigating circumstance.

The standard version of Form 2 submitted to the jury reads as follows with their choices indicated:

A. (X) We unanimously find that the following mitigating circumstances probably existed at the time of the murder:

( ) The capital murder was committed while Darrell Wayne Sheridan was under extreme mental or emotional disturbance.

( ) Darrell Wayne Sheridan has no significant history of prior criminal activity.

(X) Other: Specify in writing

*(1) That his only previous record was one DWI.*

B. (X) One or more members of the jury believed that the following mitigating circumstances probably existed, but the jury did not unanimously agree:

( ) The capital murder was committed while Darrell Wayne Sheridan was under extreme mental or emotional disturbance.

( ) Darrell Wayne Sheridan has no significant history of prior criminal activity.

(X) Other: Specify in writing:

*(1) That Pinky Sheridan left Laurie Brown to try to get away from drugs.*

*(2) That Pinky worked at a job to provide for his family.*

*(3) While incarcerated awaiting trial for nine months, he has been a model inmate.*

*(4) He loves his children and exercised his visitation rights.*

(C) (X) There was evidence of the following mitigating circumstances, but the jury unanimously agreed that they did not exist at the time of the murder:

( ) The capital murder was committed while Darrell Wayne Sheridan was under extreme mental or emotional disturbance.

( ) Darrell Wayne Sheridan has no significant history of prior criminal activity.

(X) Other: specify in writing:

*(1) He turned himself in to law enforcement after the crime.*

D. ( ) There was no evidence of any mitigating circumstance.

In explaining the jury forms to the jury before deliberation, the trial judge said:

> If you do find unanimously that one or more aggravating circumstances exist [on Form 1], you should then complete Form 2, which deals with mitigating circumstances. *Form 2 lists some factors that you may consider as mitigating circumstances. However, you are not limited to this list. You may, in your discretion, find other mitigating circumstances.*

(Emphasis added.)

In support of his argument, Sheridan cites *Penry* v. *Lynaugh*, 492 U.S. 302 (1989). In *Penry*, the United States

Supreme Court found that a criminal defendant's Eighth Amendment prohibition upon the infliction of cruel and unusual punishment is violated where he is sentenced to death and no instructions were given informing the jury that it could consider and give effect to mitigating evidence of the defendant's mental retardation and former abuse received. The United States Supreme Court has held that it is a mandatory safeguard of the Eighth Amendment for the sentencing body to be allowed to consider any mitigating factor that is relevant to the particular offender's case. *California* v. *Brown*, 479 U.S. 538 (1987); *Roberts* v. *Louisiana*, 431 U.S. 633 (1977); *Gregg* v. *Georgia*, 428 U.S. 153 (1976). The defense must be allowed during the sentencing phase to introduce any relevant mitigating evidence the defense proffers concerning the character or history of the offender or the circumstances of the offense. *California* v. *Brown*, *supra*. Not only must relevant mitigating evidence be admitted, it must be actually considered, which in appropriate cases means specifically instructing the jury to do so. *Penry* v. *Lynaugh*, *supra*; *Eddings* v. *Oklahoma*, 455 U.S. 104 (1982). In other words, any death sentence that results from a deliberate exclusion of any relevant mitigating evidence is presumptively invalid. *Hitchcock* v. *Dugger*, 481 U.S. 393 (1987).

■ Applying these U.S. Supreme Court rules to the instant case, it is clear to us that the jury was not limited to the mitigating factors listed on Form 2 but was invited by the judge to consider any others they saw fit and to write them in the blank spaces provided in each category. Therefore, the submission of Form 2 to the jury instead of the form proffered by Sheridan did not act as an impermissible exclusion of relevant mitigating factors. The court specifically told the jurors that the mitigating factors listed were not the sole ones to be considered and that they could consider other factors.

### D. JURY MAKEUP

Sheridan's next point is that his Sixth Amendment right to a jury that reflected a fair cross-section of the community was violated. Before trial, Sheridan requested that a "fair cross section of the community" be summoned for the jury by jury wheel, by random scheme and without anyone having discretion over process, and by method other than voter registration list such

as by searching utility bills for names of potential jurors.

 We have considered and rejected this argument in *Cherry* v. *State*, 302 Ark. 462, 470, 791 S.W.2d 354, 358 (1990):

> Appellant's next contention is that the jury panel should have been quashed. He argues that the selection of jurors from a list of registered voters denied him an impartial jury.

> We have held that the use of such a method to select jurors does not violate the requirement that the jury be selected from a representative cross-section of the community. *Sanders* v. *State*, 300 Ark. 25, 776 S.W.2d 334 (1989); *Mitchell* v. *State*, 299 Ark. 566, 776 S.W.2d 332 (1989). Appellant argues that the jury was partial because it was composed of the same registered voters who elected the judge and prosecutor. This argument is answered simply by saying that a list of registered voters would include those who voted for the judge or prosecutor, those who voted for their opponents and those who did not vote at all.

## E. DISPROPORTIONATE SENTENCE, CRUEL AND UNUSUAL PUNISHMENT, AND PASSION AND PREJUDICE

 Sheridan argues that the death penalty violates the cruel and unusual punishment clause of the eighth Amendment to the U.S. Constitution, and the sentence in this case was the result of the jury's passion and prejudice. This court and the United States Supreme Court have clearly held that the death penalty is not cruel and unusual punishment. *Pulley* v. *Harris*, 465 U.S. 37 (1984); *Coker* v. *Georgia*, 433 U.S. 584 (1977); *Proffitt* v. *Florida*, 428 U.S. 242 (1976); *Gregg* v. *Georgia*, 428 U.S. 153 (1976), *reh'g denied*, 429 U.S. 875 (1976); *Henderson* v. *State*, 311 Ark. 398, 844 S.W.2d 360 (1993); *Johnson* v. *State*, 308 Ark. 7, 823 S.W.2d 800 (1992), *cert. denied*, 112 S. Ct. 3043 (1992); *Coulter* v. *State*, 304 Ark. 527, 804 S.W.2d 348 (1991), *cert. denied*, 112 S. Ct. 102 (1991); *Pickens* v. *State*, 292 Ark. 362, 730 S.W.2d 230 (1987), *cert. denied*, 484 U.S. 917 (1987).

 Finally, we undertake a "proportionality review"

of his capital case which we have made a requirement under Arkansas law. We review capital cases involving the death penalty to insure that the sentence is not imposed in a freakish, capricious, or whimsical manner. *Johnson* v. *State, supra*; *Collins* v. *State*, 280 Ark. 312, 657 S.W.2d 546 (1983); *Collins* v. *State*, 261 Ark. 195, 548 S.W.2d 106 (1977). In doing so, Sheridan would have us compare his case to all capital murder and first degree murder cases occurring after July 3, 1989, the date of the passage of this act, involving any death sentence or first degree murder charged as "premeditated or deliberated." This is an improper comparison; we only compare death sentence appeals to other death sentence appeals. To do otherwise would be to compare apples to oranges.

In conducting our comparative review of death penalty cases, this court considers the following things: 1) whether the sentence was the result of passion, prejudice, or any arbitrary factor; 2) whether the evidence supports the jury's finding of any statutory aggravating circumstances; 3) whether the evidence supports the jury's findings on the question of whether the mitigating circumstances outweigh aggravating ones; and 4) whether the sentence is excessive. *Henderson* v. *State*, 311 Ark. 398, 844 S.W.2d 360 (1993).

We compared this appeal to other death penalty cases and hold that the sentence was not the result of passion, prejudice, or any arbitrary factor. Second, as discussed under Point I., above, the evidence supports the finding of the aggravating circumstance. Third, the jury was only unanimous on one mitigating factor: that his only previous criminal conviction was a DWI. Fourth, the sentence was not excessive given the violent nature of this murder and all the surrounding facts and circumstances.

In applying the factors set out above, we do not find that the jury's verdict was the result of passion, prejudice or any other arbitrary factor. We find such a holding consistent with other death penalty cases where the death penalty was given for the purpose of avoiding or preventing an arrest or effecting an escape from custody. Accordingly, we hold that the sentence of death was not freakishly or arbitrarily applied, and we will not, on our own motion, set aside the sentence. For statistical purposes, we note that both the victim and the appellant are white persons.

## III. EVIDENTIARY OBJECTIONS

### A. PHOTOGRAPHS OF THE FETUS REMOVED FROM LAURIE ANN BROWN

Sheridan next argues that photographs taken of the dead fetus removed from Laurie Ann Brown during her autopsy were shown to the jury and doing so constituted reversible error since these photos were irrelevant, inflammatory, and prejudicial.

The State responded in its initial brief that the record does not demonstrate that the pictures were ever admitted into evidence or placed before the jury and that, at most, the pictures were marked for identification purposes only. The State then filed a motion to clarify the record with this court. We granted the motion and ordered the case remanded to the trial court to settle the record.

Prior to the trial court's hearing, Sheridan filed a motion asking that the presiding judge recuse inasmuch as he had expressed a definite opinion on the merits of the issue under remand in a letter to the Attorney General on the subject. (The recusal is addressed at Point IV.) The trial judge did not disqualify himself but conducted a hearing at which time Lois Green, the court reporter at trial, testified that the photographs in question were "marked for identification only." She further stated that she set them aside so that they would not get mixed in with the other exhibits, that the jury was not given these pictures of the fetus, and that she was positive the jury did not view these photographs. As a result of her testimony, the court made the following finding:

> I think it's clear that these exhibits of the fetus during the course of the trial were ruled inadmissible by the court. They were marked for identification purposes only by the prosecuting attorney, they were delivered to Ms. Green. She retained them in her possession. They did not become available to the jury. The jury did not see these exhibits and that should settle the record with regard to the exhibits.

Sheridan's allegation fails because there is simply no evidence that the jurors actually saw the photos. An appellant must do more than allege prejudice, he must demonstrate it. *Snell*

v. *State*, 290 Ark. 503, 721 S.W.2d 628 (1986), *cert. denied*, 490 U.S. 1076 (1988). This court will not reverse on the mere potential for prejudice. *Gardner* v. *State*, 296 Ark. 41, 754 S.W.2d 518 (1988). At most, we merely have Sheridan's allegations and suspicions that the jury saw the photos.

A review of the record at trial as well as the testimony on remand of Lois Green, the court reporter, makes it clear that the jury did not see the photos of the fetus. The prosecutor used a two-part format to introduce exhibits into evidence during the trial. First, the prosecutor asked that a proposed exhibit be marked for identification. Then, after the witness identified the exhibit, the prosecutor would tender the exhibit to the trial court for introduction into evidence. The court in turn would accept or reject the tender. During the direct examination of Dr. Fahmy Malak, the state presented State's Exhibits 3 through 13 in this exact manner. In each instance, the court uniformly accepted the tender and allowed them admission into evidence.

However, the prosecutor did not complete his established pattern for introducing his exhibits into evidence when it came to the photos of the fetus, and these photos were not accepted into evidence as an exhibit to be given to the jury. The following exchange occurred;

Q. Did you photograph the fetus, Dr. Malak?

A. Yes, sir, I did.

Q. I'll ask that these three photographs, *I don't want these shown,* that these three photographs are of the fetus?

A. That's correct. I did also examine the placenta and it was a quite healthy placenta.

> PROSECUTOR ARNOLD: *I want these just marked for identification,* Your Honor. I'll ask that these three photographs just referred to by Dr. Malak, be marked for identification only as 14, 15, and 16.

> (THEREUPON, the photographs were marked for identification only as State's Exhibits No. 14, 15, and 16.)

Q. What was the cause of death of the unborn child?

A. The death of the mother.

>MR. HALL: Objection, Your Honor.

>THE COURT: The objection is sustained.

>MR. ARNOLD: Withdraw the question.

Q. Dr. Malak, you may have said earlier and I apologize if I request it again, what was the cause of death of Laurie Ann Brown?

A. Laura Brown died because of multiple stabs to her neck and torso, which led to exsanguination, or bleeding outside and inside the body.

Q. Did she strangle on her own blood?

A. She aspirated a lot of blood. That's one of the mechanisms of death.

>MR. ARNOLD: Pass the witness.

(Emphasis ours.)

It is obvious that Sheridan did not take issue with this procedure of marking the photos of the fetus for identification purposes as he failed to interpose an objection in this regard. In short, the record is completely barren of any evidence that the photos were introduced into evidence or shown to the jury or that the jury was prejudiced by the in-court discussion of these photos.

## B. STATE'S COMMENT ABOUT VICTIM DURING PENALTY PHASE

Sheridan next argues that the State made an improper comment during the closing argument of the sentencing phase:

>The Prosecutor: . . .[Darrell Sheridan] asked you to look at the way he's dressed and reminded you he'd be dressed that way the rest of his life and this is not meant to be smart or trite, but I can assure you Laurie Ann Brown today is dressed the same way she'll always be dressed and as far as—

>Mr. Hall: I object to that because any reference to the victim is improper at this point in the trial and the jury should be admonished to remember in this phase the

defendant has nothing to do with Laurie Brown.

The Court: I think the jury understands what to consider and what not to consider and you may proceed, Mr. Arnold.

After this exchange, the prosecutor concluded his closing argument and did not mention Laurie Ann Brown again.

The trial court did not specifically overrule or sustain Sheridan's objection, nor did defense counsel ask the trial court to admonish the jury. The court's failure to give an admonitory instruction was not prejudicial error in the absence of a request. *State* v. *Wheat*, 295 Ark. 178, 747 S.W.2d 112 (1988); *McFadden* v. *State*, 290 Ark. 177, 717 S.W.2d 812 (1986); *Miller* v. *State*, 269 Ark. 341, 605 S.W.2d 430 (1980).

Sheridan's argument also fails because this remark was an invited comment made in response to the closing argument of defense counsel who asked the jury to look at how Darrell Sheridan was dressed because he would be dressed like that for a long time. In reviewing both closing arguments, we conclude that Sheridan opened the door to the State's comment about what both Sheridan and the victim would be wearing from now on, and the trial court did not abuse its discretion in overruling Sheridan's objection to the prosecutor's remarks. *Nelson* v. *State*, 306 Ark. 456, 460, 816 S.W.2d 159, 161 (1991); *Allen* v. *State*, 281 Ark. 1, 660 S.W.2d 922 (1983); *Robinson* v. *State*, 275 Ark. 473, 631 S.W.2d 294 (1982).

We have said many times that the trial court has discretion to control closing argument and is in a better position to determine the possibility of prejudice by observing the argument first hand. *Wainwright* v. *State*, 302 Ark. 371, 790 S.W.2d 420 (1990). The appellate court will not reverse the action of the trial court in matters pertaining to its controlling, supervising, and determining the propriety of the arguments of counsel in the absence of manifest gross abuse. *Miller* v. *State*, 269 Ark. 341, 605 S.W.2d 430 (1980). There was no such gross abuse here.

## C. EVIDENCE OF DECEASED'S DRUG USAGE

Sheridan's theory of the case was that Laurie Ann Brown was a heavy methamphetamine abuser and that she was suffering

from a drug psychosis the night of her death which caused Darrell Sheridan to fear for his life and act in self defense. However, Sheridan failed to put on any evidence as to the effects of drugs on the victim. Sheridan subpoenaed a medical specialist from Arkansas Children's Hospital and informed the court before trial that this witness would be testifying about pharmokinetics, the effects of drugs, but Sheridan did not call this witness or any other expert to testify as to drug usage and its effects. Instead, he sought to elicit testimony on this subject from Dr. Fahmy Malak, the State's medical examiner and witness.

Sheridan argues that it was error for the court to cut short his attempt to cross-examine Dr. Malak on this subject.

This argument fails for two reasons. First, Sheridan's attorney made no proffer to the record as to what Dr. Malak would testify about as required by Ark. R. Evid. 103(a)(2). *National Bank of Commerce* v. *HCA Health Servs.*, 304 Ark. 218, 800 S.W.2d 713 (1990) (failure to make an offer of proof precludes review of the issue on appeal under Ark. R. Evid. 103(a)(2)). We recently stated in *Garner* v. *Kees*, 312 Ark. 251, 254-5, 848 S.W.2d 423 (1993):

> Appellants now argue that such a limitation on Dr. Howard's testimony prevented the jury from seeing the true character of the appellees. They contend the testimony was admissible to rebut the appellees' claim that they acted out of affection rather than spite. *See Brown* v. *Conway*, 300 Ark. 567, 781 S.W.2d 12 (1989). We disagree for two reasons: Appellants failed to make a proffer of what Dr. Howard's testimony would have been as required under A.R.E. Rule 103 (a)(2) and we have stated that failure to make an offer of proof precludes review of the issue on appeal. *Elliott* v. *Hurst*, 307 Ark. 134, 817 S.W.2d 877 (1991); *National Bank of Commerce* v. *HCA Health Services of Midwest, Inc.*, 304 Ark. 55, 800 S.W.2d 694 (1990). Moreover, it is within the discretion of the trial court to limit the testimony of witnesses and that decision will not be reversed absent a manifest abuse of that discretion. *Bennett* v. *State*, 297 Ark. 115, 759 S.W.2d 799 (1988). We cannot say appellants have demonstrated an abuse of discretion.

■ Secondly, Sheridan's attorney made no attempt to qualify Dr. Malak as an expert in this area of specialty as required by Ark. R. Evid. 702. *Wilburn* v. *State*, 289 Ark. 224, 711 S.W.2d 760 (1986); *Robinson* v. *State*, 274 Ark. 312, 624 S.W.2d 435 (1981). If Sheridan's counsel wanted to utilize Dr. Malak's testimony in this regard, he could have taken this witness as his own, qualified him as an expert in this area, and elicited the testimony. If the testimony had been denied, he could have then proffered the proof into the record to preserve his issue for appeal.

We find no "manifest abuse of discretion" by the trial court in conducting the trial.

## D. CROSS-EXAMINATION OF CHERIE BROWN AND MIKE COKER

Sheridan here makes a carte blanche complaint about the trial court's "limiting" of his cross-examination of Cherie Brown and Mike Coker. He claims his opportunity for effective cross-examination of these witnesses was denied. Following the authority cited above in III(C), we again hold that there was no manifest abuse of discretion by the trial court during the cross-examination of Cherie Brown and Mike Coker. *Garner* v. *Kees, supra*; *Bennett* v. *State*, 297 Ark. 115, 759 S.W.2d 799 (1988).

## E. STATE'S PENALTY PHASE CROSS-EXAMINATION OF ROBERT SHERIDAN

Sheridan next objects to the prosecutor's reference during the sentencing phase to Darrell "sheltering" Robert. Robert Sheridan had testified that his older brother, Darrell, always "sheltered" him growing up. The prosecutor asked Robert on cross-examination during the penalty phase of the trial:

Q. Robbie, you say your brother sheltered you?

A. Yes, sir.

Q. Was he sheltering you on Friday the tenth when he got you to go get Laurie out of the house? Did he use you to get Laurie out?

Mr. Hall: Your Honor, we've already tried the guilt in this case. This is not about the defendant.

The Court: The objection's overruled, you may proceed, just don't go too far with it, strictly punishment.

■ Sheridan fails to show how this is prejudicial error, and this matter is soundly within the discretion of the trial court.

## F. APPELLANT'S MOTION TO PERMIT THE JURORS TO QUESTION DARRELL WAYNE SHERIDAN

■ Finally, Sheridan argues that it was reversible error for the trial court to deny his motion to allow the jurors to question the defendant after the State completed its cross-examination. Sheridan fails to support this argument with persuasive authority and instead cites *Ratton* v. *Busky*, 230 Ark. 667, 326 S.W.2d 889 (1959) and *Nelson* v. *State*, 257 Ark. 1, 513 S.W.2d 496 (1974) for the general rule that juror questioning of witnesses is discretionary with the court. We hold that the trial judge did not abuse his discretion by denying this request.

## IV. JUDICIAL DISQUALIFICATION

As mentioned above, prior to considering this appeal on its merits we remanded to the trial court to settle the record and determine whether or not the photographs of the fetus were introduced into evidence or shown to the jury or merely marked for identification purposes. Prior to the hearing on remand, Sheridan moved that the presiding judge recuse himself. His motion was based primarily on the judge's letter to the Attorney General. After reading Sheridan's appellate brief, the trial judge wrote the Attorney General that "it is not true and Mr. Hall knows it is not true" that the photos of the fetus were introduced into evidence.

In his motion for recusal, Sheridan noted that the trial court had personal knowledge of a disputed fact in the case, had expressed his opinion on the merits of the factual issue to be addressed in his letter to the Attorney General, could be a potential witness at a hearing on remand, had apparently decided the issue before the hearing, and would be asked to evaluate the credibility of his own court reporter if he presided at the hearing. Sheridan argued that the trial judge violated the Code of Judicial

Conduct, which reads in pertinent part:

> (1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:
>
> (a) he has personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding. . .

Ark. Code of Judicial Conduct Canon 3(C)(1)(a) (1988).

The court responded to the motion stating:

> I have gone over everything that has been filed that has been brought to my attention and find the motion to be without merit. The court was in no way biased or prejudiced not as a matter of fact or through implication so the motion is denied.

■ The decision to disqualify from a case is discretionary with a judge and a judge's decision in this regard will not be reversed absent an abuse of that discretion. *Roe* v. *Dietrich*, 310 Ark. 54, 835 S.W.2d 289 (1992); *Travis* v. *State*, 283 Ark. 478, 678 S.W.2d 341 (1984); *Woods* v. *State*, 278 Ark. 271, 644 S.W.2d 937 (1983); *Narisi* v. *Narisi*, 229 Ark. 1059, 320 S.W.2d 757 (1959).

Obviously, the Code of Judicial Conduct and its canons are applicable to judicial conduct in criminal cases. *Adams* v. *State*, 269 Ark. 548, 601 S.W.2d 881 (1980).

■ While Judge Cole had personal knowledge concerning the disputed evidentiary fact in question, whether the photos of the fetus were introduced into evidence and shown to the jury, this does not alone disqualify his services as a trial judge.

We have held in the past that the personal knowledge of a judge gleaned from previous judicial proceedings does not fall under this "personal knowledge" category. *Roe* v. *Dietrich, supra* (Canon 3(C)(1) does not preclude participation of a judge who has obtained knowledge of a case through previous judicial participation); *Smith* v. *State*, 296 Ark. 451, 757 S.W.2d 554 (1988)(judge not required to recuse himself where appellant threatened to file a class action lawsuit in federal court against

judge for failure to promptly arraign him and others); *Holloway* v. *State*, 293 Ark. 438, 738 S.W.2d 796 (1987), *reh'g denied*, 293 Ark. 438, 742 S.W.2d 550 (1987) (judge who issued search warrant not required to recuse himself from hearing to suppress based on invalidity of warrant under Canon 3(C)(1)(a)); *Travis* v. *State*, 283 Ark. 478, 678 S.W.2d 341 (1984) (same judge who presides over a defendant's trial may also preside over postconviction proceeding).

The case before us is somewhat similar to the dilemma faced by the Arkansas Court of Appeals in *Elmore* v. *State*, 13 Ark. App. 221, 682 S.W.2d 758 (1985). In *Elmore*, during Sammy Joe Elmore's trial on charges of fleeing and criminal attempt to commit capital murder, a juror approached the trial judge and told him that she recognized someone in the defendant's family. The trial judge asked her if that would influence her judgment in the case, to which she replied it would not. The trial judge made no record of this conversation at that time, and Elmore later claimed that the trial judge's failure to record the conversation and notify him entitled him to a new trial.

After strongly emphasizing the advisability of recording conversations like this one, the court of appeals held that there was no evidence that the juror's knowledge in any way affected her decision:

> At the hearing on the motion for a new trial, it became necessary for the trial judge to testify to what had passed between himself and the juror. Appellant asked the trial judge to recuse himself from ruling on the motion for a new trial because he was going to testify in the hearing. The trial judge denied appellant's motion to recuse. This put the trial judge in the position of ruling upon his own credibility and thus open to a charge of impartiality. This is one situation that the A.B.A. Code of Judicial Conduct cautions us against. Canon 3(C)(1) of the Code states:

> > A judge should disqualify himself in a proceeding which his impartiality might reasonably be questioned, including but not limited to instances where: (a) he has. . .personal knowledge of a disputed evidentiary facts concerning the proceeding. . .

Our Supreme Court has recognized the need for a judge to disqualify when he must appear as a witness for want of a record. *Meyers v. State*, 252 Ark. 367, 479 S.W.2d 238 (1972). Our judicial system is founded upon the premise that justice is impartial. When a trial judge sits as judge and as witness, the appearance of impartiality is destroyed. It is clear that the trial judge should have recused himself when it became necessary for him to testify. However, we do not find that his failure to do so is reversible error under the facts of this particular case. While it was clearly error, we believe the appellant suffered no prejudice as a result. For the reasons discussed above, we do not believe that the trial court's failure to record the juror's communication or to inform counsel was prejudicial and therefore, appellant was not entitled to a new trial on that basis. Having reached that decision, the trial judge's failure to recuse himself becomes a moot issue.

We agree with the rationale of our Court of Appeals in *Elmore* and we hold that it was not necessary for Judge Cole to recuse under the circumstances and that Sheridan suffered no prejudice as a result.

In cases related to administrative hearings, we have held that the mere happenstance that a trier of fact has expressed an opinion on a matter under consideration does not automatically disqualify that person from further participation. *Sexton v. Arkansas Sup. Ct. Comm. on Prof. Conduct*, 299 Ark. 439, 774 S.W.2d 114 (1989). *See also Arkansas State Bd. of Nursing v. Long*, 8 Ark. App. 288, 651 S.W.2d 109 (1983) (a judge's reaction to what happens in a case based on observations of proceedings is not a ground to disqualify). Although the trial judge's conduct seemed inappropriately adversarial to appellant's counsel, the same rule applies.

Having reached this decision we hold that the trial judge's failure to recuse himself was not an abuse of discretion.

Pursuant to Ark. Sup. Ct. R. 11(f), the entire record has been reviewed, and this review has uncovered no prejudicial error warranting reversal.

Affirmed.