Donnie Wayne LOFTON *v.* STATE of Arkansas

CA CR 96-188                                          944 S.W.2d 131

Court of Appeals of Arkansas
Division II and III
Opinion delivered May 7, 1997

*Jan Thornton*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Sandy Moll*, Asst. Att'y Gen., for appellee.

ANDREE LAYTON ROAF, Judge. Donnie Wayne Lofton was convicted in a jury trial of manslaughter for causing the death of the twenty-one-month-old son of his live-in girlfriend, and was sentenced to ten years' imprisonment. He raises two points on appeal. He first argues that the trial court erred in denying his motion for directed verdict. He also contends that Judge Sam Pope should have recused and not presided over his trial because Judge Pope had been the prosecuting attorney during the initial investigation into the death of the child. We are unable to reach the merits of Lofton's first point because his motion for directed verdict addressed only the charge of first-degree murder. We further hold that Judge Pope did not abuse his discretion in declining to recuse, and affirm the conviction.

On November 13, 1994, twenty-one-month-old Christopher Chase Fleming received a blunt trauma injury to his head that resulted in his death two days later. A jury determined that the injury was caused by Lofton, in whose trailer the child had been living along with his mother and brother. The source of the injury as well as the exact time it occurred was controverted at trial.

A warrant for the arrest of Lofton was authorized by Judge Sam Pope and issued on January 24, 1995. Lofton was arrested on January 25, 1995, and released on $25,000 bond set by Judge Pope on February 1, 1995. The information charging Lofton with first-degree murder was filed May 18, 1995. The case was tried before Judge Pope on July 20, 1995. Pope had been the prosecutor until December 31, 1994, and his office had been involved in the early investigation into the child's death. The judge set June 30th as a deadline for filing pretrial motions so that they could be heard on July 3rd. After initial jury orientation on July 18th, but before jury selection, Lofton moved to have Judge Pope recuse due to his former office's involvement with the case during the time before he became circuit judge. The judge heard and denied the motion, stating in essence that it was offered too late, and that he recalled no direct involvement in the investigation and could be fair in the case.

At trial, the State produced the victim's five-year-old brother as an eyewitness. After the court determined his competency to testify, he stated that he observed Lofton throw Christopher on the couch and that the child hit his head on the wooden arm, causing him to cry for a long time. Expert medical testimony indicated that the fatal injury was consistent with hitting a smooth surface like the wooden arm on the couch.

Lofton adduced testimony that Christopher had fallen from a porch at his grandmother's home several days previously. Christopher's mother, Kinda Fleming, stated that Lofton told her that Christopher had fallen from his porch while she was away at a video rental store on the day the fatal injury allegedly occurred. The time of the injury was brought into question by Fleming's statements to emergency medical personnel that the child had been fine all day up to and including when Lofton had put him to bed. Fleming indicated that she became aware of a problem only after she awoke to the sound of Christopher's labored breathing, and found he had an elevated temperature. Expert medical testimony indicated that the injury would have caused the child severe distress for several hours before he was brought to the emergency room.

Lofton moved for a directed verdict on the charge of first-degree murder at the close of the State's case, and for a directed verdict on the charges of first- and second-degree murder at the close of all the evidence. The motions were denied, and he was convicted of manslaughter and given a ten-year sentence.

### 1. Directed verdict

■ Lofton argues that the trial court erred in denying his motion for a directed verdict at the end of the State's evidence and at the end of all the evidence. However, the State asserts correctly that because Lofton's motion for a directed verdict at the close of the State's case addressed only first-degree murder, he has not preserved the issue of whether there was sufficient evidence to convict him of manslaughter. In *Jordan v. State*, 323 Ark. 628, 917 S.W.2d 164 (1996), the supreme court held that in order to preserve for appeal the issue of sufficiency of the evidence, the defendant must have addressed the lesser-included offense he was convicted of by name or by the culpability required. Because Lofton failed to challenge the sufficiency of the evidence for manslaughter at the close of the State's case and at the end of all the evidence, his argument on this point is procedurally barred.

### 2. Recusal

Lofton also contends that the trial court erred when it denied his motion asking that the court recuse. As an initial matter, the State asserts that this argument is not preserved for appeal because the motion for recusal was untimely. Although the motion was filed well after the deadline set by the trial court for the filing of pretrial motions and only two days before Lofton's scheduled trial date, the trial court heard the motion on its merits before denying it.

■ In Arkansas, the state constitution provides the grounds for the disqualification a judge: "No judge or justice shall preside in the trial of any cause in the event of which he may be interested, . . . or in which he may have been of counsel . . . ." Ark. Const. art. 7, § 20. While disqualification of a judge may be waived, ignorance of the grounds for disqualification cannot con-

stitute such a waiver, and if a party discovers the grounds after the trial has been completed, it is grounds for reversal on appeal. *See Byler v. State*, 210 Ark. 790, 197 S.W.2d 748 (1946). Consequently, we cannot conclude that the motion was not properly before the trial court or that the trial court's ruling on it was not properly preserved for review.

As to the merits, Lofton cites Canon 3E(1) of the Code of Judicial Conduct as authority for his assertion that Judge Pope should have disqualified himself from the proceeding. It states in pertinent part:

> (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
>
> . . .
>
> (b) the judge served as a lawyer in the matter of controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter.

*Arkansas Code of Judicial Conduct*, Canon 3E(1).

Lofton contends that because Judge Pope's term as the elected prosecutor coincided with the pendency of the investigation from November 13 to December 31, 1994, he became privy to certain information received in the prosecutor's office during this period. Lofton submits that four documents are evidence of the personal involvement by Judge Pope in the investigation into Christopher's death: 1) a notice of child maltreatment form issued by ADHS dated November 14, 1994, and addressed to Sam Pope; 2) investigation notes prepared by Bill Setterman dated November 17, 1994, indicating that Setterman told Chief Deputy Prosecuting Attorney Joe Wray that Lofton had lived with two other women whose small babies died; 3) a request from Setterman to "Sam or Joe" dated November 21, 1994, for a subpoena duces tecum to Ashley Memorial Hospital for all records of Christopher and the two other infants who died; and 4) a subpoena issued by Joe Wray on December 16, 1994, to G and W Family Clinic for treatment records of Christopher since his birth.

Lofton further notes that Judge Pope granted the arrest warrant on January 24, 1995, after Municipal Judge Reid Harrod failed to find probable cause and suggests that, while it is not evidence of actual bias, this act puts into question Judge Pope's impartiality. The State contends in response to Lofton's arguments that the prosecutor's office merely received the four documents listed by Lofton, and that they are not evidence of Judge Pope's personal involvement in the investigation. Moreover, the State contends that no "case" existed against Lofton until he was arrested on January 25, 1995, and consequently, Judge Pope did not serve as a lawyer in the prosecution of Lofton.

■ We do not agree with Lofton's argument that Canon 3E(1) of the Arkansas Code of Judicial Conduct provides the basis for reversal of his conviction. Judge Pope denied any involvement in the investigation into Christopher's death, and even if his deputy, Joe Wray, was directly involved during the relevant period, the commentary to Section 3E(1) states:

> A lawyer in a governmental agency does not ordinarily have an association with other lawyers employed by the agency within the meaning of Section 3E(1)(b) . . . A judge formerly employed by a governmental agency, however, *should* disqualify himself . . . in a proceeding if the judge's impartiality might reasonably be questionable because of such association.

Moreover, the preamble to the Code of Judicial Conduct states that the Code should be applied "consistent with constitutional requirements, statutes . . . [and] decisional law" and "construed so as not to impinge on the essential independence of judges in making judicial decisions." Significantly, the preamble further provides:

> The Code is designed to provide guidance to judges and to provide for a structure for regulatory conduct through disciplinary agencies. It is not designed or intended as a basis for civil liability or criminal prosecution. Furthermore, the purpose of the Code would be subverted if the Code were invoked by lawyers for mere tactical advantage in a proceeding.

■■ We thus turn to the decisional law involving former prosecuting attorneys who have later served as trial judges in pro-

ceedings in which their impartiality has been questioned. We first observe that in construing Canon 3E(I), Arkansas appellate courts have stated that there is a presumption of impartiality, and the party seeking disqualification has the burden of proving otherwise. *Turner v. State*, 325 Ark. 237, 926 S.W.2d 843 (1996); *Gentry v. State*, 47 Ark. App. 117, 886 S.W.2d 885 (1994). Furthermore, the decision to recuse is within the trial court's discretion and will not be reversed absent abuse. *Turner, supra.* An abuse of discretion can be proved by a showing of bias or prejudice on the part of the trial court. *Turner, supra.* In *Turner*, the supreme court stated:

> We initially observe on this point that there was no showing by Turner that he was treated unfairly in the trial of this matter. In fact, in Turner's reply brief, his counsel admitted that Turner was treated fairly at trial.

*Id.* at 244, 926 S.W.2d at 847.

Although *Turner* involved a trial judge who had prosecuted the appellant for other crimes before taking the bench, Lofton has likewise not alleged actual bias in his brief or asserted that he was treated unfairly by Judge Pope in the trial of his case.

Furthermore, we have not discovered any decisions which suggest that Judge Pope's recusal was mandated in this case. In *Fisher v. State*, 206 Ark. 177, 174 S.W.2d 446 (1943), the supreme court held that a trial judge who signs the information or criminal indictment as prosecuting attorney has been "of counsel," and is disqualified to preside in the trial of the case under the Arkansas Constitution. However, Lofton was not arrested and the information was not filed against him while Judge Pope served as prosecutor and we do not find that he had been "of counsel" in Lofton's case under the holding of *Fisher*.

In *Jordan v. State*, 274 Ark. 572, 626 S.W.2d 947 (1982), the supreme court held that a trial judge who formerly prosecuted a defendant on three of four felony convictions used to enhance punishment is not disqualified under Ark. Const. art. 7, § 20, because the prohibition against his presiding in a case in which he was "of counsel" relates to the case being tried. However, Jordan also alleged actual bias, and the court stated that the fundamental issue was whether under the circumstances the

judge's impartiality might reasonably be questioned, pursuant to Canon 3 of the Code of Judicial Conduct, and held that there was no objective intimation of bias or prejudice in the proceedings. Here, Lofton argues that Judge Pope based his refusal to recuse on "time constraints" and states that it can be assumed that Judge Pope's caseload was heavy and that his docket was full. Although Lofton questions Judge Pope's authorization of the arrest warrant, he acknowledges that he could not show that Judge Pope was biased or prejudiced in any way at the hearing on his recusal motion, and states that his concern is with the "appearance of impropriety or conflict of interest." Lofton does not argue actual bias, and, as in *Jordan*, we do not find any objective intimation of bias or prejudice. Moreover, in *Jordan*, the court stated that it regarded the appellant's allegation of the "appearance of bias" as subjective.

■ We conclude that Judge Pope's recusal was not mandated by either Canon 3E of the Code of Judicial Conduct or Ark. Const. art. 7, § 20, and that the decision to recuse was within the discretion of the trial court in this instance. As Lofton has not alleged that Judge Pope was biased or unfair in the proceedings, we cannot say that his refusal to recuse was an abuse of discretion.

Affirmed.

ROBBINS, C.J., and PITTMAN, ROGERS, and MEADS, JJ., agree.

GRIFFEN, J., dissents.

WENDELL L. GRIFFEN, Judge, dissenting.

> *The proper administration of the law requires not only that judges refrain from actual bias, but also that they avoid all appearances of impropriety.*
>
> City of Jacksonville v. Venhaus, 302 Ark. 204, 788 S.W.2d 478 (1990) (citing Bolden v. State, 262 Ark. 718, 561 S.W.2d 281 (1978).
>
> *Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety . . . . The test for appearance of impropriety is whether the conduct would create in reasonable minds*

> *a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired.*
> Commentary to Canon 2, Section A, Arkansas Code of Judicial Conduct.

Although I agree with the majority that we cannot reach the merits of Lofton's first point because his motion for directed verdict only dealt with the charge of first-degree murder, and while I do not question the sufficiency of the evidence to convict appellant of manslaughter, I respectfully disagree with the decision affirming Judge Pope's failure to recuse. The decision to affirm ignores a cardinal principle of justice: that the decision-maker avoid even the appearance of impropriety. Indeed, our decision essentially renders the requirement that a judge disqualify in a proceeding in which his impartiality *might reasonably be questioned* to mean that even when impartiality might reasonably be questioned, a refusal to recuse based on these facts is not an abuse of discretion. This reasoning ignores the realities of our trial process. It also disregards the power imbalance facing the litigant who reasonably questions the impartiality of a trial judge before trial, but lacks proof of actual bias or prejudice. Finally, I cannot reconcile the result in contrast to the standard practice of dismissing prospective jurors from jury service in trials "for cause" upon similar proof.

The law does not guarantee perfect trials, meaning trials without legal errors. However, the law guarantees to each person a trial before a decision-maker whose impartiality is beyond reasonable dispute. That is the obvious purpose of the provision in the Arkansas Constitution that prohibits judges from presiding "in the trial of any cause in the event of which he may be interested, . . . or in which he may have been of counsel . . . ." Ark. Const. art. 7, § 20. The Arkansas Code of Judicial Conduct and its canons also apply to judicial conduct in criminal cases. *Sheridan v. State*, 313 Ark. 23, 852 S.W.2d 772 (1993). Canon Two of the Code states: "A judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities." This high regard for impartiality is also why Canon 3E(1) of the Code of Judicial Conduct provides that a judge *shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned.* The preamble to the Code states that when "shall" is used in the

text, it is intended to impose binding obligations that can result in disciplinary action if violated. Whether one refers to such ancient legal codes as the writings of Moses, those of ancient philosophers, or more recent authorities on legal ethics, avoidance of the appearance of impropriety is central to every justice system in the history of human civilization. The idea that judges should avoid even the appearance of partiality or favoritism is so deeply rooted in our sense of justice that we do not require proof of actual bias or prejudice toward litigants as the sole basis for disqualifying jurors or judges. Rather, disqualification is mandated if reasonable questions may be asserted concerning the impartiality of a judge or prospective juror.

The majority decision disregards·this basic aspect of justice by emphasizing the fact that Lofton has not shown that the trial judge demonstrated actual bias or prejudice. That fact does not address the real issue. Justice demands that the trial system be trustworthy, even if it is not otherwise perfect. Judges may err on legal rulings even when there are no reasons to question their impartiality, and judges whose impartiality might reasonably be questioned may conduct trials without actually manifesting bias or prejudice. The issue is not whether a judge whose partiality might reasonably be questioned has been shown to be biased or prejudiced in a proceeding; rather, the issue is whether a judge whose partiality might reasonably be questioned should even conduct the proceeding in the first place.

There were substantial reasons to question the impartiality of the trial judge in Lofton's case. This homicide case involved the death of a twenty-one-month-old boy from a blow to his head allegedly caused when Lofton threw the boy onto a couch where the boy's head struck a wooden arm. The trial judge was prosecuting attorney in Ashley County when the infant died. After the injury occurred, the notice of child maltreatment issued by the Arkansas Department of Human Services was addressed to "Sam Pope, Prosecuting Attorney." The medical examiner addressed a letter to Pope, in his capacity as prosecuting attorney, concerning the cause of death. On or about November 21, 1994, an investigator submitted a request to "Sam or Joe" (Pope's chief deputy prosecuting attorney), for a subpoena *duces tecum* so that records

could be obtained related to the death of the boy in this case as well as two other infants who had died while Lofton had lived with their mothers. The subpoena *duces tecum* was issued by Joe D. Wray, Chief Deputy Prosecuting Attorney, under Pope's name, to obtain the medical records for the victim in this case. Even if Pope lacked actual knowledge about the results of these inquiries, the facts plainly show that investigative issues and information were addressed to him in his official capacity as prosecuting attorney, and that his chief subordinate acted on it.

One must then consider whether these factors might reasonably cause one to question the impartiality of a person in Judge Pope's position. If a layperson had been involved in a similar situation, there is no doubt that he or she would have been disqualified from jury service in this case without any requirement that actual bias or prejudice be shown. Indeed, virtually every jury trial in Arkansas begins with the trial judge asking the prospective members of the jury whether they are acquainted with the facts of the case to be decided and whether they have a current or previous relationship with one of the parties. Although mere general knowledge that a crime allegedly occurred does not disqualify one from serving as trier of fact, the majority has not cited one case where a former prosecutor has been upheld in serving as judge or juror *in the same case* that his office investigated before he assumed judicial office. Nobody suggests that an employee from the prosecutor's office who changed jobs between the time of the investigation and the trial would have been deemed an impartial observer so as to qualify as a juror at Lofton's trial.

The State argues that Judge Pope was not personally involved in the investigation merely because the prosecutor's office received the previously-mentioned documents, and that there was no case against Lofton until his arrest on January 25, 1995, twenty-five days after Judge Pope's tenure as prosecuting attorney ended. The "no case" argument is unpersuasive. The police and prosecuting attorney's office were investigating Christopher Fleming's injury as a possible crime beginning as early as November 14, 1994 (the day after he sustained the head injury and one day before he died), based on the notice of child maltreatment that was addressed to "Sam Pope, Prosecuting Attorney," from the Department of

Human Services. Within a week after Christopher died, the investigation had widened to include an effort to subpoena the medical records related to two other children who died while Lofton lived with their mothers. The prosecutor's office was clearly pursuing leads that it considered incriminating against Lofton while Judge Pope was prosecuting attorney.

The office of prosecuting attorney involves the proprietary duty of assisting in the investigation and prosecution of suspected criminal activity. Homicide cases receive top priority, and the normally intense investigative and prosecutorial focus of that office in homicide cases is heightened even more for cases involving suspected child abuse. This case attracted considerable notoriety in Ashley County, as one might reasonably expect. One might also reasonably expect that even a prosecuting attorney whose tenure was about to end would not have been ignorant or disinterested about the fatality, the growing investigation, and the role of his office in it. That reasonable expectation is confirmed by the fact that investigative inquiries were routed to Pope as prosecuting attorney and acted upon by his chief deputy. These factors would cause one to reasonably question the impartiality of the former prosecutor who became judge to preside over the trial of the person accused of killing a child by throwing him onto a piece of furniture.

It is certainly true that the Code of Judicial Conduct should not be applied in ways that unreasonably impinge on the ability of judges to serve with independence from unwarranted influences, and that the Code is not intended or designed to serve as a basis for civil liability or criminal prosecution. I also recognize that the Code does not further its essential purpose if trial lawyers are permitted to invoke it to gain a tactical advantage or "judge-shop." These realities do not justify appellate courts in disregarding the plain language of a rule that mandates a judge's recusal in a proceeding where his impartiality might reasonably be questioned and treating the failure to recuse as something other than an abuse of discretion. The State has not shown that Judge Pope's recusal would have been tactically advantageous to the defense, and the record does not justify that conclusion.

The abuse-of-discretion standard applied to trial judge rulings on motions for recusal serves a valuable purpose. Yet the goal of protecting the independence of judges from unreasonable challenges is not advanced by using the standard to shield judges from the very kind of conduct that would disqualify a layperson from serving on a jury, and that the Code of Judicial Conduct defines as mandating recusal. Trial judges possess great power, including power to issue search warrants, issue arrest warrants, impose bail conditions, and decide pre-trial disputes about the evidence that prosecutors hope to present to show guilt even before trial occurs. Even when a case is tried to a jury, the trial judge decides evidentiary issues that are often reviewed only on the abuse-of-discretion standard.

Where reasonable questions arise about the impartiality of a trial judge, the concerned litigant faces a particularly difficult problem. Only the judge in question can hear and grant a motion to recuse. However, an unfavorable ruling on a recusal motion is not ordinarily subject to interlocutory appeal. Therefore, the accused person who reasonably questions the impartiality of a trial judge based on clear proof that the trial judge served as prosecutor during the investigation of the matter over which he now presides must, under this decision, make a motion to recuse, and then have the former prosecutor preside over the trial of the very proof that his former office assembled under his supervision. The judge whose impartiality might reasonably have been questioned based on previous association with the prosecution in the case is the same person who will determine the fitness of prospective jurors, some of whom may deserve disqualification for having relationships equal to the relationship that the judge had. Where there are challenges to the proof, the accused must wonder how the judge can be impartial about the fruit of his former employment. If the accused challenges the trial judge on the ground of bias or prejudice, he does so knowing that the same person whose impartiality warranted questioning before trial will not likely view a direct allegation of favoritism or prejudice during the trial as an impartial observer. Throughout the trial, everyone will know that the former prosecutor, *now* judge, will be responsible for significant judgment calls ranging from whether to direct a deadlocked jury to

continue deliberations or declare a mistrial, whether to accept a jury recommendation on sentencing, whether to grant defense motions for directed verdict or new trial, and whether to permit post-conviction release pending appeal. The issue is not whether the former prosecutor will make accurate legal rulings as trial judge; the issue is whether having the former prosecutor preside over the case at all is fair given these realities.

It is unfortunate that we do not recognize the inherent unfairness in holding that one party to a trial must accept as judge a person who headed the agency that investigated and now prosecutes the very case that he will be required to defend. It is unrealistic to believe that the average citizen will not question why appellate judges are unwilling to declare unfair what our own ethical code calls improper, and what we recognize as just cause for excusing laypersons from jury service. If Lofton had been tried by a different judge with the same result, no one could question the fairness of the process, even if they disagreed with the outcome. Regrettably, our decision will do nothing to encourage judges to recuse in similar future situations, and does nothing to remove the suspicion that whatever one thinks about the outcome in this tragic case, the process was unfair.

I respectfully dissent.