James SURRIDGE *v.* STATE of Arkansas

CR 82-105                                    650 S.W.2d 561

Supreme Court of Arkansas
Opinion delivered May 9, 1983
[Rehearing denied June 13, 1983.]

*Harkey, Walmsley, Belew & Blankenship*, by: *John M. Belew*, for appellant.

*Steve Clark*, Atty. Gen., by: *William C. Mann, III*, Asst. Atty. Gen., for appellee.

GEORGE ROSE SMITH, Justice. Russell Ratliff, 61, had been a resident of Pine Bluff for some time before he disappeared on December 4, 1980. More than a month later his badly decomposed body was found by police officers on the Surridge property in Desha County, over 50 miles from Pine Bluff. James Surridge, the appellant, was charged with capital murder in the course of robbery. He was found guilty of first-degree murder and was sentenced to a 50-year term, to run concurrently with a commuted life sentence for murder from which he was on parole at the time of Ratliff's death. For reversal it is argued that the State's evidence was insufficient to present a jury question and that certain hospital records and x-rays should not have been considered by the medical examiner in identifying Ratliff's body.

First, the sufficiency of the evidence. The State's proof was entirely circumstantial in that there was no eyewitness testimony about the shooting. The jury was correctly instructed that circumstantial evidence must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. AMCI 106. On appeal, however, the judgment must be affirmed if the verdict is supported by substantial evidence. "Substantial evidence is that which is more than a scintilla and must do more than create a suspicion of the existence of the fact to be established; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Phillips* v. *State*, 271 Ark. 96, 607 S.W.2d 664 (1980). Evidence is not substantial if it leaves the fact finders "only to speculation and conjecture in choosing between two equally reasonable conclusions, and merely gives rise to a suspicion." *Smith* v. *State*, 264 Ark. 874, 575 S.W.2d 677 (1979).

There is no possible doubt about Ratliff's having been murdered. There is no possible doubt that some person committed the murder by shooting Ratliff twice in the back

of his head. The issue is simple: Was the evidence so evenly balanced that the jury had to resort to guesswork in finding that the crime was committed by Surridge rather than by someone else? No. We have no doubts about the sufficiency of the proof. In fact, we think the evidence clearly establishes Surridge's guilt to the exclusion of any other reasonable conclusion.

For several months before Ratliff's disappearance on December 4, he and Surridge, age 74, both living alone, had lived across the hall from each other in an 8-unit apartment house in Pine Bluff. During that fall Surridge made several inquiries about obtaining a gun, for protection and squirrel hunting. Some weeks before Ratliff's disappearance Surridge acquired a rifle with a detachable scope (telescopic sight). He showed the rifle to three persons who testified at the trial: Russell Ratliff's brother; the owner of the apartments; and the greatgrandson of Mrs. Jewell Cook, a lady whom Surridge was seeing about every day.

In October, Russell Ratliff received $1,619 in a personal injury settlement. For a time he left the money with his lawyers for safekeeping, but in November he obtained the money from them and deposited the check in a bank.

Russell Ratliff, who had a drinking problem, called his brother, W. E., apparently in late November, and asked him to get a lawyer to defend Russell on a public drunkenness charge. W. E. went to Russell's apartment on December 1 and had to wait a few minutes until Surridge and Russell drove up in Surridge's pickup truck, saying they had been to the bank. In Surridge's presence Russell took two rolls of bills from his pockets and from one of the rolls handed W. E. two twenties and a ten to pay the lawyer's $50 fee.

On December 4, the day of Russell's disappearance, he called W. E. early in the morning and asked W. E. to take him to see a doctor. W. E. was unable to do so. Russell said he would get Surridge to take him. Russell did not have a car, and Surridge had often furnished him transportation. The State proved that Russell did go to the doctor that morning and was given three prescriptions, which he had filled at a

pharmacy at about 11:00 a.m. There is no proof that he was ever seen alive again.

A day or two later W. E. went to Russell's apartment, but he was not there. W. E. visited with Surridge, who said that on Thursday (December 4) he had taken Russell to a doctor's office, a drugstore, and a grocery, where Russell had bought beer. Surridge said that when they got back to the apartment house there were two black men waiting in a gray pickup truck. Ratliff joined the two men, after telling Surridge that one of them had worked for him in the past.

W. E. continued to worry about Russell's absence and came to see Surridge daily until Surridge began to dodge him. On December 9, W. E. reported to the police that Russell was missing and gave them the information Surridge had supplied. A week or so later the police found Surridge, at Mrs. Cook's house. He talked freely, telling the police the same story he had told W. E. and adding that after dropping Ratliff near the apartment house he had himself gone to the Senior Citizens Center for lunch.

Eventually Surridge became the principal suspect. Among the incriminating facts discovered by the police and later disclosed to the jury were three in particular. One, Surridge's tale about Ratliff's having recognized one of the two black men was quite improbable. Ratliff himself had been unemployed for more than ten years, so it was hardly likely that his former employee, after that length of time, would turn up to renew Ratliff's acquaintance at the very moment when Surridge needed someone to blame for Russell's disappearance. Two, the Senior Citizens Center kept records which indicated that Surridge had not come for his meal on December 4. Third, Surridge had openly displayed his .22 rifle when he had no motive for murder, but after Ratliff's disappearance Surridge denied to the police that he had owned or possessed a rifle. It is a familiar rule that a defendant's false and improbable statements explaining suspicious circumstances against him are admissible as proof of guilt. *Jones* v. *State,* 61 Ark. 88, 101, 32 S.W. 81 (1895); see also *Kellensworth* v. *State,* 276 Ark. 127, 633 S.W.2d 21 (1982).

On January 6, 1981, Desha County officers and Pine Bluff officers searched the Surridge property. It is deserted and remote from any town. It is reached by traveling 1.5 miles east from Rohwer to the Mississippi River levee and then 4.4 miles south along the road on the levee. The Surridge property is next to the levee. The house, 439 feet west of the levee, had once been occupied by Surridge's brother, but it had been vacant for almost 20 years. The land had grown up in weeds and bushes. The police found Ratliff's body 84 feet north of the house. The weeds were over six feet high and so thick that one had to be "almost on top of the body" to see it. Owing to the cold there was very little odor. The body was clothed, with nothing in the pockets. Next to the body were a half-used matchbook and a beer can half full. The only witness for the defense testified that fingerprints on the can were not Surridge's. Whether they were Ratliff's is not shown; the medical examiner's assistants could not raise fingerprints from the decomposed body.

Surridge was arrested on January 7 and readily consented to a search of his apartment, saying he had nothing to hide. In the apartment the officers found a Glenfield scope for a .22 rifle, on the floor under a dresser. They also saw some matchbooks, the significance of which they did not then realize. A week later they went back and got the matchbooks, which were of an unusual design that matched the one found by Ratliff's body.

There was expert testimony that death was caused by two .22-rifle shots into the back of Ratliff's head, at such close range that the weapon was in contact with the skin. The fragments of the bullets could have been fired from a Glenfield rifle or any one of three other makes. The date of death was fixed as having been between December 3 and December 10.

No possible suspect except Surridge himself is shown to have been familiar with the Surridge property. Mrs. Cook and Surridge went to Desha County twice in the fall to visit Surridge's friends who lived five or six miles from the Surridge land, but they did not to go the Surridge property on those trips. Mrs. Cook testified that they went back on

New Year's Day, but spent only about 15 minutes there looking at the house, which Surridge talked about repairing if the two of them should marry. Surridge also took Ratliff to Desha County in about October, but there is no indication that they visited or had any reason to visit the deserted Surridge property.

We need not narrate the proof in complete detail. It was argued to the jury and again here that the unidentified black men may have murdered Ratliff, but that argument rests only on Surridge's unsworn statements and fails for want of any indication that either the men or Ratliff could somehow have found the way to the Surridge property, for no apparent reason.

By contrast, the State proved that Surridge had robbery as a possible motive, that he was the last person known to have seen Ratliff alive, that he had a rifle similar to the one that was used, that he denied that incriminating fact, that he had the opportunity to commit the crime, that he alone was familiar with the Surridge property over 50 miles from Pine Bluff, and that the telltale scope and matchbooks were in his apartment. The defense stresses the fact that the weapon was never found, but that argument cuts both ways. In the fall Surridge wanted to own a rifle and openly displayed it. But after the murder it would have been incriminating and could readily have been disposed of as Surridge drove homeward along the river for more than four miles. To say that the jury was confronted with a choice between two equally reasonable explanations of the murder appears to us, as it did to the jurors, to be a wholly untenable position. In fact, any attempt to construct an alternative theory, such as that the black men somehow went to the Surridge property and killed Ratliff, necessarily involves unfounded speculation and conjecture.

The appellant's other point for reversal questions the trial judge's action in permitting Dr. Malak, the state medical examiner, to identify the body by comparing x-rays taken during the autopsy with x-rays of Russell Ratliff that Dr. Malak had obtained from St. Vincent Hospital in Little Rock. The argument is that under Uniform Evidence Rule

803 (6), Ark. Stat. Ann. § 28-1001 (Repl. 1979), the custodian of the hospital x-rays should have been called to identify them as records made in the usual course of business. That rule, however, has been modified by Act 255 of 1981, which permits hospital records to be authenticated by an affidavit of the custodian with the same effect as if the custodian were present and testified to the matters stated in the affidavit. Ark. Stat. Ann. §§ 28-935 to -943 (Supp. 1981). That statutory procedure was followed in this case; so Dr. Malak's comparison of the two sets of x-rays, which he showed to be identical, was proper. Moreover, Uniform Evidence Rule 703 provides that an expert witness may base his opinion upon facts or data not admissible in evidence if of a type reasonably relied upon by experts in the particular field. The St. Vincent records and x-rays were not introduced in evidence, but they were marked for identification and are in the record. They, together with the medical examiner's testimony, form an adequate basis for the identification of the body.

Affirmed.