Charles Franklin DIX *v.* STATE of Arkansas

CR 86-39 715 S.W.2d 879

Supreme Court of Arkansas
Opinion delivered September 22, 1986
[Rehearing denied October 27, 1986.*]

*Purtle, J., would grant.

*Steve Kirk*, for appellant.

*Steve Clark*, Att'y Gen., by: *Mary Beth Sudduth*, Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. The body of William Norman was found just off the concrete turnaround area at the end of a rest stop on I-40 in Conway County. Charles Dix, the appellant, who had been Norman's traveling and drinking companion in the few days before the body was found, and who was later arrested while driving Norman's car, was convicted of first degree murder and sentenced to life imprisonment. His appeal questions the jurisdiction of the trial court and the sufficiency of the evidence to support the conviction. We find no error.

The undisputed facts are that Dix was arrested in Tennessee

on April 5, 1985, for driving a motor vehicle while not in possession of a driver's license. He was released on a bond provided by Owens and Owens, a bonding company, and he began hitchhiking. He was picked up by Norman, and the two of them, on April 7, Easter Sunday, drove to Mayflower, Arkansas, where Norman's brother lived. A witness testified that Norman and Dix asked directions to Norman's brother's home, and that Norman was driving a Ford station wagon with Arizona license plates. Norman spent one night in his brother's home while Dix slept in Norman's car. The day of April 8 was spent by Norman and Dix drinking beer and driving to Little Rock in an unsuccessful attempt to visit Norman's nephew. Norman's brother had told him he was welcome in his home but not if he and Dix continued drinking. Norman told a family member he was trying to get rid of Dix who would soon resume hitchhiking.

The night of April 8 was apparently spent by Norman and Dix in Norman's station wagon parked at Lake Conway in Faulkner County. On the evening of April 9, Norman's car was seen driving down an embankment to Lake Conway. The car was seen in the vicinity of the lake at 7:00 and again at 9:00 p.m.

When the body was discovered on the morning of April 10, a witness, Zane Owens, who had spent the night camped at the rest area, was interviewed by the police. He reported, as he also testified at the trial, that he had noticed Norman's body at the end of the rest area at approximately 10:00 p.m. the night before, but he had had no reason to suspect Norman was dead. It looked to Owens as if Norman were sleeping on the ground, as he was covered by a blanket and some rags. He also saw a blue Pontiac Bonneville with an open door near the body and assumed the car was in some way related to Norman's presence there.

After Norman's body was identified, police were taken by his brother's wife to the place on the lake where Norman and Dix had camped. There they found a large stick with blood on it as well as beer cans and other debris including a torn Tennessee traffic citation issued to "Charles Dickey" by the Tennessee Highway Patrol. The name was one Dix admitted to using because he could not get a driver's license or car insurance in his own name due to multiple arrests for driving without a license. Also found was a torn business card of Owens & Owens, "licensed bondsmen."

The state medical examiner testified that Norman was killed by blows to the head which appeared to be consistent with having been made by a blunt, wooden, rounded object, and by strangulation. A nylon hose or panty hose was found around Norman's neck, and the neck showed signs of strangulation. The medical examiner testified he estimated the time of death to have been sometime before midnight on April 9. The alcohol found in the blood and stomach of the victim showed he was so drunk he was on the verge of passing out and thus defenseless when he was killed.

In his defense, Dix testified that on Monday, which would have been April 8, he and Norman stayed at the lake, and the morning of April 9 they drove to Little Rock and returned to the lake sometime after 6:00 p.m. He said Norman told him he, Norman, was not going to fool with his family any more but was going to Oklahoma City, and they were planning to sleep at the lake again and then drive together the next morning to Oklahoma City. Dix said he then went to sleep in the back seat after removing his artificial leg to get comfortable. According to his testimony he awakened at 2:00 or 3:00 a.m. to find a stranger driving the car toward Oklahoma City. When Dix inquired about Norman, the stranger said he had "put him out." The stranger then made him get in the front seat without putting his artificial leg back on; upon reaching Oklahoma City made him exchange Norman's Arizona license plates for Oklahoma tags, still without reattaching the artificial leg; and then drove to Austin, Texas, where the stranger, whom Dix had come to know as "Bobby," walked away from Dix and the car, telling Dix to forget he had ever seen him.

Dix was arrested for driving Norman's Ford station wagon while intoxicated in Austin. He again identified himself as Charles Dickey. He was later identified as the person who had been with Norman before Norman was killed, and he voluntarily submitted to extradition to Conway County. The Oklahoma license plates on the car were traced to an Oklahoma City car dealer.

Officers who interviewed Dix in Conway County testified about a statement that Dix had given the Texas authorities in which he said he had hitchhiked through Missouri and Oklahoma and denied having been in Arkansas. When told by Texas officers

he was wanted for murder in Arkansas, Dix said he knew nothing about what happened in Arkansas and would not discuss it with them until he had gotten an Arkansas attorney.

## 1. Jurisdiction

Dix's argument is that because the bloody stick was found by Lake Conway in Faulkner County, and because some witnesses testified about the likelihood that the body had been moved, Conway County in which the body was found lacked jurisdiction to try him. The Morrilton police chief, who investigated the crime, testified it was his opinion that Norman had been killed in Faulkner County. He did not state his basis for that opinion.

The Conway County Circuit Court does not have jurisdiction to try an offense committed elsewhere. Ark. Stat. Ann. § 43-1408 (Repl. 1977). The state need not prove jurisdiction, however, "unless evidence is admitted that affirmatively shows that the court lacks jurisdiction." Ark. Stat. Ann. § 41-110 (Repl. 1977). In *Gardner* v. *State*, 263 Ark. 739, 569 S.W.2d 74 (1978), cert. den., 440 U.S. 911 (1979), we held that "before the state is called upon to offer any evidence on the question of jurisdiction, there must be *positive evidence* that the offense occurred outside the jurisdiction of the court." 263 Ark. 746, 569 S.W.2d 77 (emphasis supplied).

In *Richards* v. *State*, 279 Ark. 219, 650 S.W.2d 566 (1983), the appellant testified the murder victim had jumped from a car he was driving forty miles an hour. The medical examiner testified the victim was run over by a heavy vehicle but her death had occurred before she was run over. We held the testimony that the death occurred earlier was no positive evidence that the crime occurred in any particular place. The same is true here. The strongest factor cited by the appellant is that a bloody stick, which may have been the murder weapon, was found in Faulkner County. There was no evidence presented of blood on the ground near where the stick was found. Nor was there evidence of blood in the victim's car. There was just no positive evidence from which a juror could say, based on the record before us, where the crime occurred. We cannot say that the police chief's opinion, elicited on cross examination and not supported by any further testimony given by him or by any evidence of record, may be considered to be the kind of affirmative or positive

evidence required to place the burden on the state to prove the crime occurred in Conway County.

### 2. Sufficiency of the Evidence

Our burden on appeal is to decide whether the jury's verdict is supported by substantial evidence. *Mason v. State*, 285 Ark. 479, 688 S.W.2d 299 (1985). We view the evidence in the light most favorable to the jury's verdict. *Westbrook v. State*, 286 Ark. 192, 691 S.W.2d 123 (1985).

When the drunken association of Dix and Norman in close proximity to Norman's death is considered along with Dix's general condition of being a stranded hitchhiker with no vehicle and his having been arrested driving Norman's car, and these facts are combined with the improbable story Dix told about the disappearing stranger, the evidence becomes sufficiently substantial for affirmance. We regard Dix's story as being improbable for several reasons. First, he and Norman had agreed to go to Oklahoma City. Norman certainly did not go, but that is the direction taken by the stranger. Second, Dix would have had the jury believe he was being held in semi-captivity by the stranger due to the stranger's refusal to let Dix put his artificial leg on, and yet the stranger sent him out of the car to get the Oklahoma license plates. Third, there was evidence that Dix told Texas authorities a very different story from the one he related on the witness stand. A Texas investigator's notes which were made when Dix was arrested in Texas showed that after his DWI arrest Dix denied having been in Arkansas but said he had come to Texas through Missouri and Oklahoma.

In *Jones v. State*, 61 Ark. 88, 32 S.W. 81 (1895), we approved an instruction containing these words: "If you find from the evidence that the defendant has made any false, improbable and contradictory statements explaining suspicious circumstances against him, then this may be considered by you." 61 Ark. at 101, 32 S.W. at 85. Our approval of the jury giving weight to the making of false and improbable statements on the part of the accused was restated in *Surridge v. State*, 279 Ark. 183, 650 S.W.2d 561 (1983). Again, we hold that the appellant's statements, combined with the other evidence of "suspicious circumstances against him" were sufficient to constitute substantial evidence of guilt.

### 3. Other Objections

In compliance with Arkansas Supreme Court and Court of Appeals Rule 11(f) we have concerned ourselves with an objection Dix's counsel made when Dix stated that he declined to speak further with Texas authorities about any incidents in Arkansas until he had obtained a lawyer. The objection was that in cross examining Dix about his inconsistent statement to Texas authorities the prosecution was "forcing" Dix to reveal that he had insisted upon his right to counsel.

There is no question here about admissibility of any statement Dix may have made after invoking his right to counsel. Nor is there any doubt that Dix's revelation that he invoked his right to counsel was completely voluntary. He was being asked about whether he had told Texas authorities about the stranger who had brought him to Texas. Dix's response was that he told the Texas authorities he had waived extradition to Arkansas and did not want to talk about it until he had talked to his lawyer.

Dix's counsel contended at the trial that the reference to refusal to talk without obtaining legal advice was analogous to the prosecution mentioning an accused's refusal to testify on his own behalf. We know of no authority to that effect.

We find no prejudice. Even if it could possibly be considered prejudicial for the state to point out that an accused refused to respond to interrogation absent counsel, in this case it was brought up by the accused and not the state.

Affirmed.

PURTLE, J., dissents.

JOHN I. PURTLE, Justice, dissenting. The only fact connecting the crime to Conway County was the discovery of the body of the victim of this murder in Conway County. The only evidence having a tendency to locate the place of the murder indicated it occurred near Lake Conway in Faulkner County.

Although the corpse was found in Conway County about an hour after the victim and the appellant were seen together at Lake Conway, the uncontroverted testimony by the state medical examiner was that the body had been moved after the death. Death was caused by trauma from a blunt instrument and/or by

strangulation. The apparent murder weapon, a blunt stick or club, with human blood on it, was found at Lake Conway where the parties were last seen. The Morrilton Chief of Police, who investigated the murder, concluded it happened in Faulkner County.

Proof of lack of venue is clearly discernible in the majority opinion. I agree with the opinion where it states that the state need not prove jurisdiction "unless evidence is admitted that affirmatively shows that the court lacks jurisdiction." We stated in *Gardner* v. *State*, 263 Ark. 739, 746, 569 S.W.2d 74 (1978), that "before the state is called upon to offer any evidence on the question of jurisdiction there must be positive evidence that the offense occurred outside the jurisdiction of the court."

Arkansas Statute § 41-110(2) (Repl. 1977) states: "[t]he state is not required to prove jurisdiction or venue unless evidence is admitted that affirmatively shows that the court lacks jurisdiction or venue." The statute also specifically requires that "jurisdiction" and "venue" be proven by the state "beyond a reasonable doubt" when there is such affirmative evidence.

Article 2, Section 10, of the Arkansas Constitution provides that "the accused shall enjoy the right to a speedy and public trial by impartial jury of the county in which the crime shall have been committed. . . ." the Sixth Amendment to the Constitution of the United States reads as follows: "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law. . . ."

The danger of allowing a defendant to be tried in any county where the victim's body is found is that it expands the jurisdiction of the courts beyond their statutory and constitutional limitations. It creates the possibility of a body being moved to another county. This Court has, in my opinion, legislated a venue change which serves the public interest and the desire of the Court. Even though the purpose is a noble one it has been accomplished in the face of existing law. We have authority to point out needed changes in the law, but not to enact legislation or amend the Constitution.

I would reverse and remand the matter for a trial in Faulkner County, where the crime no doubt occurred.