John Floyd YOUNG v. STATE of Arkansas

CR 93-181                                              871 S.W.2d 373

Supreme Court of Arkansas
Opinion delivered March 7, 1994

*David E. Smith*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. Appellant, John Floyd Young, appeals a judgment of the Saline Circuit Court convicting him of the capital murder of Raymond Jacobs and sentencing him to life in prison without parole. He asserts nine points for reversal of the judgment. We find merit to the arguments concerning the luminol evidence and the testimony of Larry McGuire; therefore we reverse and remand for a new trial.

## I. SUFFICIENCY OF THE EVIDENCE

Appellant moved for a directed verdict of acquittal at the close of the state's case and again at the close of all the evidence. On appeal, appellant argues in effect that all the evidence used against him was tainted and that if the evidence he alleges was improperly admitted had been excluded, the remaining evidence is insufficient to support his conviction.

The preservation of an appellant's right to freedom from double jeopardy requires a review of the sufficiency of the evidence prior to a review of any asserted trial errors. *Lukach* v.

*State*, 310 Ark. 119, 835 S.W.2d 852 (1992) (citing *Harris* v. *State*, 284 Ark. 247, 681 S.W.2d 334 (1984)). Therefore, although raised as the final point of error, we address appellant's challenge to the sufficiency of the evidence prior to the remaining points of trial error. In determining the sufficiency question, we disregard any alleged trial errors. To do otherwise would result in the avoidance of the sufficiency argument by remanding for retrial on other grounds. *Harris*, 284 Ark. 247, 681 S.W.2d 334.

On appeal, the appellate court does not weigh the evidence but simply determines whether the evidence in support of the verdict is substantial. *Sheridan* v. *State*, 313 Ark. 23, 852 S.W.2d 772 (1993). Substantial evidence is that which is forceful enough to compel reasonable minds to reach a conclusion one way or another. *Id.* In determining whether there was substantial evidence, the appellate court reviews the evidence in the light most favorable to the appellee, and it is permissible to consider only that evidence which supports the guilty verdict. *Thomas* v. *State*, 312 Ark. 158, 847 S.W.2d 695 (1993).

The evidence revealed that the victim, Raymond Jacobs, was age sixty-two years when he was murdered; he was retired and raised horses and bird dogs in Benton, Arkansas. The victim's wife left him at home on May 8, 1992, at approximately 7:30 a.m. She was unable to reach her husband by telephone throughout the day. When Mrs. Jacobs returned home from work she realized her husband was missing. Mrs. Jacobs contacted her son, Keith Jacobs, who had not seen his father all day. Keith Jacobs went to his father's barn to look for him and found his father inside the barn lying face down in a pool of blood. His father's body was lying on a pitchfork so that the handle was raised into the air. His father had sustained numerous blows to the head. Keith Jacobs observed a claw hammer his father usually kept in the barn was missing and saw a large amount of blood splattered on the inside walls of the barn. Keith Jacobs opined that his father had been dead for some time as his body was cold and stiff to the touch.

Keith Jacobs was at the barn on April 29, 1992, when his father bought several dogs from appellant for $2,500.00. Upon discovering his father's body, he also observed that all but one of the dogs his father had purchased from appellant were miss-

ing. Larry McGuire of Greenville, Missouri, testified that he purchased a dog from appellant in the fall of 1991; that he reported the dog stolen around April 28, 1992; and that he subsequently found his dog at the victim's kennels in August 1992.

Chief Deputy Jerry Easom of the Saline County Sheriff's Department investigated Raymond Jacobs's murder. He and Deputy David Smith traveled to Springfield, Missouri, to investigate the missing dogs as a lead in the murder investigation. They talked with appellant at his home where he admitted to being at the victim's barn, along with his driver Kenneth Thomas Trimble, around 7:30 or 8:00 a.m. on the day Raymond Jacobs was murdered.

Jerry Hailey of Springfield, Missouri, testified that he sent a dog with appellant on the 28th or 29th of April 1992 to be sold to a possible buyer in Texas. Hailey received the dog back from appellant nine or ten days later. Keith Jacobs identified that dog as one his father purchased from appellant.

Ray Marquis of Weaubleau, Missouri, testified that he sent his female dog with appellant on April 28, 1992, to be bred in Texas. He wanted the dog back, and Tom Trimble returned the dog on May 8, 1992. Keith Jacobs identified that dog as one his father purchased from appellant which was later missing after the murder.

Trimble initially refused to testify at appellant's trial but was immunized by the trial court and ordered to testify. He had already been tried for the murder of Raymond Jacobs. At appellant's trial, Trimble stated he went with appellant to Raymond Jacobs's kennels late on Thursday, May 7, 1992. Trimble understood appellant had made arrangements to pick up some dogs without contacting the victim. Appellant then informed Trimble that the victim had bought and paid for the dogs. Trimble informed appellant he would not have any part in stealing the dogs. Appellant decided to return for the dogs at daybreak since he was unable to identify the dogs in the dark. The two spent the night at a motel in Benton and returned to the victim's house the next morning, May 8, 1992. Appellant went inside the Jacobs's house for thirty to forty-five minutes. All three men then went to the victim's barn and kennels.

Trimble testified he entered the victim's barn to get an air crate for the dogs. Trimble took the crate to appellant's truck and began fiddling with a broken latch on a dog pen in the truck. Trimble then went to the barn to check on appellant and the victim. Trimble observed appellant backing out of the barn door. When appellant turned around he had blood all over him and was carrying a raincoat and an object inside a paper bag. Appellant stated to Trimble, "The old son of a bitch wouldn't sell them back. He wanted cash, not a check." The two men headed for Springfield, and along the way disposed of their shoes, clothing, the raincoat, and the hammer which was apparently inside the paper bag. They arrived in Springfield and returned the dogs to their owners.

Dr. William Q. Sturner, Chief Medical Examiner for the Arkansas State Crime Laboratory, performed the autopsy on Raymond Jacobs. He testified Jacobs died of cranial cerebral trauma or injuries to the head including the scalp, skull and brain. Dr. Sturner found multiple fragmented fractures on Jacobs's skull and extensive hemorrhaging to the brain. He testified Jacobs's hands had numerous lacerations which occurred prior to death that indicated Jacobs had struggled in a defensive manner. Dr. Sturner observed a total of sixty-six injuries on Jacobs's body, some of which could have been caused by a hammer, others which could have been caused by a pitchfork, with the most significant being the head injuries.

When considering the foregoing evidence, the jury could reasonably conclude that appellant murdered Jacobs. The evidence is substantial evidence in support of a guilty verdict. We cannot say the trial court erred in denying the motion for directed verdict of acquittal.

## II. LUMINOL TESTING

Appellant argues the trial court erred in allowing the testimony of Dr. Phillip Whittle, Ph.D., as to the results of luminol tests he performed on appellant's truck. The luminol tests were ordered after law enforcement officials observed what they thought was blood on the exterior and various parts of the interior on the passenger side of appellant's truck. Dr. Whittle testified that he performed luminol tests on the interior and exterior of appel-

lant's pick-up truck that produced positive results for blood. He stated that luminol is an organic chemical compound that reacts with blood and other substances such as nickel, copper, and hydrochloride bleach. He also stated that luminol reacts with any kind of blood that has hemoglobin in it, including animal and human blood.

Dr. Whittle's report was also admitted into evidence. His report indicated positive luminol reactions on six areas of appellant's truck. However, his report also contained the following language: "Note: Luminol provides a very sensitive presumptive test for the presence of blood; other confirmation tests must be conducted to verify the presence of blood."

The only evidence appellant presented in his behalf were some reports from the Arkansas State Crime Laboratory showing that follow-up tests did not confirm the presence of human blood on appellant's truck.

In *Brenk* v. *State*, 311 Ark. 579, 847 S.W.2d 1 (1993), we held it was reversible error to admit evidence of luminol testing showing positive results for blood without also admitting evidence of follow-up tests confirming the presence of blood. We stated that luminol tests done without follow-up procedures are unreliable to prove the presence of human blood or that the substance causing the reaction was related to the alleged crime. Recently in *Palmer* v. *State*, 315 Ark. 696, 870 S.W.2d 385 (1994), we affirmed the *Brenk* case stating that "[t]he *Brenk* decision settles the issue that the mere presence of human blood by luminol testing without factors which relate that evidence to the crime is not admissible[.]" *Id.* at 698, 870 S.W.2d at 386. Thus, when positive luminol tests cannot be confirmed by other evidence, the luminol test results become irrelevant and their admission into evidence confuses the jury.

Given that the follow-up tests from the State Crime Laboratory did not confirm the presence of human blood in the present case, *Brenk* indicates that error occurred here. The state concedes that error occurred, but argues there was no prejudice to appellant.

We cannot agree that the luminol evidence constituted harmless error. There was conflicting evidence presented as to whether

human blood was present in appellant's truck. In addition to the luminol test results and Dr. Whittle's testimony, there was Trimble's testimony that appellant returned from the barn with blood "all over his bibs [overalls] and shirt and collars and hands and arms" and that appellant later rode home in the passenger seat of his truck. Contradictory to this evidence was the State Crime Laboratory report that did not confirm the presence of human blood on appellant's truck. Trimble was accused of the same crime for which appellant was tried. Trimble's credibility was therefore subject to question by the jury. The jury could have reasonably chosen not to believe Trimble's testimony and thereby placed more reliance on the luminol evidence.

Accordingly, we cannot conclude the admission of the luminol evidence was harmless error. We reverse on this point and remand for a new trial.

## III. EVIDENCE ACQUIRED PURSUANT TO IMMUNITY — TESTIMONY OF LARRY MCGUIRE

Appellant argues the trial court erred in admitting evidence acquired pursuant to his grant of immunity. However, the only specific piece of evidence appellant challenges is the testimony of Larry McGuire. Therefore, we limit our discussion to that particular evidence. Appellant contends the trial court erred in allowing Larry McGuire to testify at trial because his testimony was a direct result of statements given to the police by appellant pursuant to the grant of immunity and because his testimony involved evidence of appellant's prior bad acts.

First, we consider the argument that McGuire's testimony should have been excluded by the trial court because it was a direct result of appellant's grant of immunity. Appellant relies on *Kastigar* v. *United States*, 406 U.S. 441 (1972), and *Murphy* v. *Waterfront Comm'n*, 378 U.S. 72 (1964), and argues the state had the burden of proving a legitimate source for the testimony independent of appellant's cooperation under immunity.

We agree the state had the burden of proving an independent legitimate source for the disputed evidence used in appellant's trial. *Hammers*, 261 Ark. 585, 550 S.W.2d 432 and *Kastigar*, 406 U.S. 441; *Murphy*, 378 U.S. 52. Appellant filed an appropriate motion for a *"Kastigar* hearing" requesting the court

to conduct a hearing at which the prosecution should present all the evidence it proposed to use against appellant and prove such evidence to be derived from a legitimate source wholly independent of the information appellant gave while under immunity. In support of this request for a hearing, appellant filed a second motion in limine asking the court to exclude McGuire's testimony and to prohibit the prosecutor from mentioning the anticipated testimony of McGuire during *voir dire*, opening statement, the questioning of witnesses, and in closing arguments.

In furtherance of his second motion in limine, appellant further stated to the trial court that McGuire's testimony was not admissible under A.R.E. Rules 403 and 404 as it was not independently relevant and unfairly prejudicial. Appellant also stated that McGuire's testimony constituted evidence of "other crimes," the total affect of which would be proving the character of appellant and that he acted in conformity therewith in the Jacobs homicide.

At the threshold of trial, the trial court stated that before it would go into the question of a *"Kastigar* hearing," it would consider the motions to suppress. At that time it was brought to the trial court's attention that appellant's second motion in limine was pending with reference to McGuire's anticipated testimony. The following discussion ensued:

> MR. SMITH: I also filed a motion concerning Larry McGuire's testimony. If he's not to be called then that will moot that particular motion.

> MR. HARMON: I had informed Mr. Smith that I had information that Mr. McGuire might not show up and I didn't want Mr. Smith depending on my subpoena to get Mr. McGuire here if he wanted him here.

> MR. SMITH: Mr. McGuire testified in Mr. Trimble's trial that he thought Mr. Young sold him a dog and later that dog turned up missing. That he suspected Mr. Young had the dog stolen and the dog was later identified by a picture by Mr. McGuire as being his dog that was found at Mr. Jacobs' kennels. I don't know why Mr. McGuire's testimony would be pertinent in this case. I don't know for what purpose it would be offered by the prosecution other

than to insinuate that Mr. Young either stole the dog he sold to Mr. McGuire or had it stolen.

MR. HARMON: Mr. McGuire had a dog that he had bought from Mr. Young. The dog came up missing. Mr. Young called him after the dog was missing and offered to buy the dog. The dog was then found after Mr. Jacobs' death in his kennel as one of the dogs that Mr. Young had brought to him.

MR. SMITH: That's not quite the story. He testified in the Trimble trial that Mr. Young had called him sometime after the dog turned up missing and discussed another dog, but not the dog that was allegedly stolen, which was not even discussed during that telephone conversation. He testified that he thought Mr. Young was trying to feel him out about the white dog. They don't have any evidence that Mr. Young committed a prior wrong.

THE COURT: He can testify that he bought the dog from Mr. Young, that the dog was stolen, and that he can identify the dog, and that is the dog. He can't say anything that would be no more than just a bare suspicion that Mr. Trimble or Mr. Young stole the dog. This is a situation where I'm going to have to know precisely what his testimony is before I can rule further than that.

MR. HARMON: It can prove just exactly what happened in this case. That Mr. Young sold dogs to individuals and then stole them back, which is the exact method and mode of operation in this case.

MR. SMITH: The problem is, this dog wasn't stolen from Raymond Jacobs' kennels.

THE COURT: The motion is premature and I can't rule on it yet because there's a certain foundation that has to be laid. I have to know what evidence precedes the offer of this evidence before I'll know whether it is or is not relevant. The motion will be denied at this time.

In chambers, during a recess of the trial, appellant again voiced his objection to McGuire's anticipated testimony. The following scenario took place:

MR. HARMON: The only other thing I think we need to bring up at this time is Mr. McGuire's testimony, Mr. Smith is objecting to his testifying. Mr. McGuire is the owner of the dog that was missing but showed up in Mr. Jacobs' kennel after his death. One of the dogs that was purchased from John Young.

THE COURT: Well, I may need, someone needs to proffer the testimony and let me make—

MR. HARMON: I'll get that transcript, Your Honor.

## LARRY McGUIRE

### DIRECT EXAMINATION

My name is Larry McGuire, I live in Greenville, Missouri, Rt. 2, Box 282. I am the County Clerk of my County. I've bought several bird dogs from John Young. The dog I bought later turned up missing from my pen. It would have been somewhere around probably September, September or October, '91. I'm going to say I reported the dog missing to the Sheriff's Department at Dade County probably April 28th. The dog was found in Jacobs' kennel right here in Benton, Arkansas. It has been returned to me.

### CROSS EXAMINATION

I think it's been admitted who stole my bird dog. It's my understanding that John admitted stealing my bird dog, John Young admitted stealing my bird dog. On the 28th day of April, I did not have any facts of who stole my bird dog. I suspected the dog had been stolen. I later received a phone call from John Young at which time he offered to buy back a black dog. This was not the dog that was stolen. I have nothing other than supposition to support any assertion that John Young stole my bird dog.

THE COURT: The proffer that was made did not go to the question of who stole the bird dog. Is that all you're going to offer?

MR. HARMON: That's all I'm going to offer.

THE COURT: What you have offered will be admitted into evidence.

MR. SMITH: May I ask, Your Honor, for what purpose?

THE COURT: I think it has some relevancy with regard to the possession and identity of the dog.

MR. HARMON: Keith Jacobs testified that he was there the day that John Young brought that dog to Raymond Jacobs. That's the relevancy.

MR. SMITH: That's not relevant.

THE COURT: Yes, it is, too.

MR. SMITH: What issue is it relevant?

THE COURT: I'm not going to argue with you about it, I've ruled that it is and it's going to be admitted into evidence you and Mr. Harmon can argue about it if you want to.

MR. SMITH: I want my record clear on this that I object to it based upon the facts brought forth in my motion in limine. It can prove absolutely nothing. It is an attempt to prove a prior bad act, which is totally inadmissible to prove that someone acted in conformity therewith. This dog was not taken from Mr. Jacobs' kennel. It cannot be proof of an attempt to steal dogs because that dog was not stolen. It can't be proof of motive for the killing of Raymond Jacobs because that dog was not stolen from Raymond Jacobs. It can't prove anything. I'm just trying to make a record.

THE COURT: The Court has ruled that the proffer of evidence has some relevance and that there is no prejudice that would be caused that would down play the relevance of the proffered testimony.

(Witness excused.)

MR. SMITH: Your Honor, I simply want to make the additional objection that the proffered testimony of Larry McGuire even as it stands under the proffer, is obviously

tainted by his knowledge that statements given by John Young pursuant to a grant of immunity, which were obviously well after the fact, it was a derivative use of that information used as a result of the grant of immunity. For that reason, I believe it's inadmissible.

THE COURT: That's it.

(THEREUPON, the Court, Counsel for the State and Defense and the Defendant returned to the courtroom[.])

Prior to McGuire's testimony at trial, appellant again voiced his objection:

MR. SMITH: Your Honor, for the record please note by Rule 403 and 404 B objection to this testimony.

THE COURT: Yes, sir.

Although the trial court did not make a specific finding or ruling as to whether McGuire's testimony was derived from a legitimate source independent of appellant's cooperation while under immunity or that it violated A.R.E. Rules 403 and 404, it is obvious that counsel for Young made appropriate objections which were rejected by the trial court, thus, preserving his rights under *Kastigar* and our rules of evidence.

At trial, McGuire testified that he lived in Greenfield, Missouri; that he knew appellant; that he bought a dog from appellant in the fall of 1991; that in April 1992 he reported the dog missing to the sheriff's department; and that he later found the same dog at the victim's kennels in Benton, Arkansas, in August 1992. Given the contents and nature of McGuire's testimony as summarized above, it is obvious McGuire's testimony does much more than imply confirmation of evidence presented from other sources indicating that appellant sold Jacobs a dog prior to the murder. Granted, McGuire did not testify that appellant admitted stealing McGuire's dog. However, this is of no moment, for, in fact, McGuire's testimony dictates only one conclusion — that appellant sold McGuire a bird dog, reacquired the dog without McGuire's knowledge or consent, then transported the dog to Arkansas and sold it to the victim, Mr. Jacobs. Simply put, appellant's conduct displayed a prior bad act and involvement in "other crimes." By accepting this testimony in evidence, the trial court

violated A.R.E. Rules 403 and 404; this evidence was not independently relevant and unfairly prejudicial in that this evidence of another crime, as accepted, proved the character of appellant and that he acted in conformity therewith in Jacobs's homicide. In addition, this conduct on the part of appellant, as testified to by McGuire, is not dissimilar to the facts of this case in that appellant had sold several dogs to Jacobs, received money therefor, and was then in the process of reacquiring these dogs without Jacobs's knowledge or payment to Jacobs when a confrontation took place between appellant and Jacobs at which time Jacobs was killed.

Recapitulating, McGuire's testimony was brought about as a direct result of appellant's grant of immunity by the trial court, and the state has failed in its burden to prove a legitimate source for this testimony independent of appellant's cooperation under immunity. *Kastigar* v. *United States*, 406 U.S. 441 (1972), and *Murphy* v. *Waterfront Comm'n*, 378 U.S. 72 (1964). Further, McGuire's testimony showed a prior bad act on the part of appellant, appellant's involvement in "other crimes," that McGuire's acquired testimony was more prejudicial than probative, and that such testimony was not admissible under A.R.E. Rules 403 and 404. For these reasons, the trial court abused its discretion in letting this testimony into evidence; the evidence was prejudicial and as such it is necessary that we reverse and remand this case for retrial. We address the remaining points only to the extent they are likely to arise on retrial.

## IV. REVOCATION OF IMMUNITY

The trial court entered an order on June 4, 1992, granting appellant immunity from prosecution of any crimes arising from Jacobs's death. In return for immunity, appellant agreed to supply complete and truthful information relating to the investigation of the murder. Appellant also agreed to testify truthfully at any hearing or trial relating to Jacobs's murder. The state filed a petition to revoke appellant's immunity alleging that appellant breached the agreement by providing false information to the prosecutor and law enforcement officers. On August 24, 1992, the trial court held a hearing on the state's petition to revoke appellant's immunity and granted the petition.

Appellant contends the order granting him immunity from prosecution was improperly revoked on a pretext after he had supplied sufficient evidence to convict his co-defendant, Kenneth Thomas Trimble, of capital murder. The state contends the immunity was justifiably revoked because appellant did not honor the immunity agreement.

At the hearing on the petition to revoke appellant's immunity, the state introduced various statements appellant had given which were inconsistent with each other and with the physical evidence. These statements are summarized in the following paragraphs.

Prior to receiving immunity on June 4, 1992, appellant gave two statements. On May 10, 1992, appellant was interviewed at his home as a possible witness; he admitted to being at Jacobs's barn on the morning of Jacobs's murder but said that Jacobs was alive when he and Trimble left. On May 11, 1992, appellant waived his *Miranda* rights and was interviewed as a possible suspect. In the May 11 statement, appellant maintained Jacobs was alive when he and Trimble left the barn. Also in the May 11 statement, appellant was questioned about the possible presence of blood in his truck and denied it was Jacobs's blood. Appellant then invoked his right to counsel.

After appellant was granted immunity on June 4, 1992, he accompanied Saline County Sheriff's deputies on a trip to recover physical evidence. Deputy Smith's notes of that trip reflect the following:

### INTERVIEW OF WITNESS

This date, June 4, 1992, Captain Easom and myself traveled to Clinton, Arkansas with John Floyd Young.

During the trip, Young told investigators that the following scenario occurred during the death of Raymond Paul Jacobs:

. . . .

. . . Young stated that after arriving at the kennels, he and Jacobs walked around for a few minutes as he was attempting to talk him out of the dogs. Young stated that

Trimble was inside the barn at this time and that Jacobs had walked into the barn. Young stated that he walked over to look at one of the dogs and heard a thump and then heard a groan and went into the barn to find that Trimble had struck Jacobs on the head with a hammer. Young stated that Trimble ordered him to get the dogs out of the pens and to load them onto the truck. Young stated that he did that and that they then left. Young stated that he was afraid that Trimble might kill him too.

Also after he was granted immunity, appellant gave a statement on July 16, 1992. In the July 16 statement, appellant's version of his involvement in the crime changed considerably from the version he gave on the trip to Missouri as he admitted to participating in the murder:

[H]e [Jacobs] just turned and walked into the barn and I'm and I go in with him and I'm arguing with him . . . . And Mr. Jacobs just kinda turned and walked away from me, as he did Mr. Trimble picked up a pitch-fork and said, Stop. And when he did Mr. Jacobs kinda turned and come back towards me, and he said, Grab me [him]. And like a idiot I grabbed him. And in the process I feeling you know I fell his body flinch and Mr. and Mr. Trimble hits him with a hammer. I don't' remember if it was two, I feel him go limp in my arms. He's heavy I mean I not that you know, I let him fall down. Mr. Trimble turns towards me and says, Load the "F" dogs. And I said, what are we gonna do? And he said, Load the "F'en" dogs! So I went outside loaded the dogs, and me and Mr. Trim, him and Mr. Trimble was in the barn. I loaded my dogs, three dogs, the four, three was on one side, over toward his house on his house side. And I come back Mr. Trimble is outside washing off.

In addition to presenting the preceding documents, the state also presented witnesses at the hearing to revoke appellant's immunity. The state called the medical examiner, Dr. Sturner, who testified that he was familiar with appellant's July 16, 1992 statement. Dr. Sturner opined to a reasonable degree of medical certainty that Jacobs's death could not have occurred in the manner described in the July 16, 1992 statement. His opinion was based on the fact that the statement that Jacobs was struck twice

with a hammer was inconsistent with Jacobs's injuries. Dr. Sturner testified that Jacobs had multiple injuries to the head, between fifteen and twenty, possibly more; that Jacobs had multiple fragmented fractures; and that the severity of the brain injuries indicated more than two blows occurred. Dr. Sturner also stated that Jacobs had numerous defensive injuries to his hands indicating Jacobs struggled, which was possible but unlikely if appellant pinned Jacobs's arms to his sides.

Appellant testified at the hearing to revoke his immunity and admitted he lied in several of his prior statements. On cross-examination, he stated that he lied in the May 10, 1992 statement. He also stated that he lied on June 4, 1992, the day he was granted immunity. He admitted that he had lied about being in the barn and holding the victim while Trimble struck him. He explained that he left out parts of his involvement in the murder because he was ashamed. He stated, "The only thing I've ever lied about was holding him. Since the sixteenth you got the truth and you know you did."

On cross-examination, appellant read from the above-quoted portion of his July 16, 1992 statement and then stated as follows:

[Reading from the July 16 statement] "We got in the truck and went the opposite way than we normally do. You go out, other words, when your leaving Mr. Jacobs' barn, if you're standing —" [Resuming testimony on cross-examination] And that's when he hit him about fifty, that's when his head was beat off. I didn't say, and I told you numerous times, I didn't tell you he just hit him the two times and you know that.

Despite appellant's testimony to the contrary, the July 16, 1992 statement does not reflect that appellant stated Jacobs was struck fifty times.

The trial court heard all the foregoing evidence and concluded that the state had not acted in bad faith in revoking appellant's immunity. The trial court considered only those statements made subsequent to the immunity and determined that appellant had contradicted himself and that his statements did not match the physical evidence. The trial court also observed that appellant's testimony at the hearing was inconsistent with his prior

statements. The trial court then granted the state's petition to revoke appellant's immunity and stated that none of the information gained from appellant as a result of his immunity could be used in his trial.

This court has previously stated that the determination of a claimant's equitable entitlement to immunity, when opposed by the prosecuting attorney, should lie within the sound judicial discretion of the trial court. *Hammers* v. *State*, 261 Ark. 585, 550 S.W.2d 432 (1977). The trial court should ensure that the promise made by the prosecutor is kept when the claimant has fulfilled the agreement in good faith. *Id.* It is appropriate to consider the extent of the claimant's performance of the bargain and that the primary purpose of the exchange is to facilitate the prosecution of the crime, not to grant the immunity. *Id.* The burden of proving the agreement and compliance with it rests with the claimant. *Id.*

We cannot say the trial court abused its discretion in granting the state's petition to revoke appellant's immunity. The trial court determined the immunity agreement was a matter of record and therefore need not be proven by appellant. Appellant admitted he lied about his participation in Jacobs's murder. That lie occurred after appellant was granted immunity. Therefore, there is a factual basis to support the trial court's determination that appellant breached the terms of the immunity agreement. *See Abner* v. *State*, 479 N.E.2d 1254 (Ind. 1985) (holding that a defendant who admits to lying is not entitled to the benefit of an immunity agreement). Accordingly, we cannot find an abuse of discretion.

We are well aware of appellant's contention that the state's justification for the revocation is merely a pretext and that the revocation was actually based on appellant's refusal to take a polygraph examination. However, as previously stated, there is a factual basis to support the revocation, and appellant has offered no proof of pretext.

## V. TESTIMONY OF KENNETH THOMAS TRIMBLE

During Trimble's trial, Trimble's videotaped statement was entered into evidence; during closing argument, the prosecutor commented that Trimble's statement was hogwash and a lie. The

prosecutor also told the jury that Trimble lied to save his own life. During appellant's trial, Trimble testified under immunity as the state's witness; his testimony was consistent with his videotaped statement entered at his own trial. However, during closing argument at appellant's trial, the prosecutor told the jury that Trimble was telling the truth.

Appellant argues that the prosecutor's conduct amounts to the knowing use of false evidence and therefore, in addition to being an ethical violation of Rule 3.3(a)(4) of the Rules of Professional Conduct, violates his Fourteenth Amendment due process rights according to *Miller* v. *Pate*, 386 U.S. 1 (1967).

*Miller* does stand for the proposition that the knowing use of false evidence violates a defendant's Fourteenth Amendment rights. However, appellant has not demonstrated that the prosecutor knew Trimble's statement and testimony to be false. Such proof is required to demonstrate a deprivation of appellant's Fourteenth Amendment rights. Such proof would also be required to exclude the evidence on remand.

## VI. MAY 11, 1992 VIDEOTAPED STATEMENT

Appellant argues reversible error occurred when the trial court admitted a videotaped statement given by appellant on May 11, 1992, in Springfield, Missouri, prior to the granting of immunity. The videotape in question was admitted at a suppression hearing, and the trial court ruled admissible the portion of the statement up to the point at which appellant invoked his right to counsel. However, as the state points out in its brief, the videotaped statement was never shown to the jury nor was it ever admitted into evidence at trial. Obviously then, no error occurred here and it is unlikely the state will seek its admission on remand.

## VII. TRIAL JUDGE'S RECUSAL

Appellant contends that Canons 2 and 3(C)(1) of the Arkansas Code of Judicial Conduct required the trial court's recusal in this case. Specifically, appellant argues the trial judge should have recused because his son was employed in the prosecutor's office. At the hearing on the motion to recuse, the trial judge stated that his son was twenty years old, that he no longer lived in the judge's home, and that he was a part-time temporary employee as an

errand boy in the hot checks division of the prosecutor's office. The trial court stated the relationship was so insignificant it was simply not a factor and denied the motion to recuse.

Appellant urges the appearance of impropriety resulting from his son's employment was complicated further by the fact that the trial judge's impartiality might reasonably be questioned when he would have to rule on the allegations of professional misconduct made against his son's employer in this case.

■ This point is addressed in Part IV of our opinion in *Trimble* v. *State*, 316 Ark. 161, 871 S.W.2d 562 (1994). We do not discuss the reasoning of this issue here, but simply state that no canons were violated.

## VIII. DISQUALIFICATION OF PROSECUTOR'S OFFICE

■ Appellant contends the only way to ensure that no information derived from appellant's immunity could be used against him was to disqualify the prosector and all members of his office. However, appellant cites us to no authority requiring such a far-reaching disqualification. Appellant does cite *Kastigar*, 406 U.S. 441, as authority under this point. However, that case does not require a prosecutor's recusal; rather, it requires the state to prove that any evidence presented against a defendant came from a legitimate source independent of the defendant's immunity. In the absence of authority requiring such, we cannot say that the prosecutor's office must disqualify on retrial.

## IX. AUDIOTAPED STATEMENT OF MAY 10, 1992

Appellant challenges the admission of a statement he gave as a possible witness on May 10, 1992, when Deputies Easom and Smith went to appellant's home in Springfield, Missouri. The deputies were investigating the theft of the victim's dogs. The deputies audiotaped appellant's statement, did not read him any *Miranda* warnings, and told appellant he was a possible witness in the victim's murder case. At the suppression hearing, the trial court ruled appellant's statement was voluntary and non-custodial, and therefore appellant had not met his burden of proving the statement's inadmissibility.

■ On appeal, appellant admits the admission of the tape itself was not error, but argues that as a result of its admission,

the prosecutor was allowed, in effect, to put appellant on the stand and then impeach his credibility with other inconsistent evidence. As the statement was given in appellant's home when he was not yet a suspect, there was no requirement that he be advised of his *Miranda* rights. This court has often stated that a defendant's false and improbable statements explaining suspicious circumstances against him are admissible as proof of guilt. *Thomas* v. *State*, 312 Ark. 158, 847 S.W.2d 695 (1993) (citing *Bennett* v. *State*, 297 Ark. 115, 759 S.W.2d 799 (1988), and *Surridge* v. *State*, 279 Ark. 183, 650 S.W.2d 561 (1983)). In the statement, appellant admitted to being at the victim's barn on the morning of the murder but says the victim was alive when he and Trimble left. In subsequent statements, appellant admitted that Jacobs was not alive when he and Trimble left the barn. On retrial, the inconsistent statement would therefore be admissible to show appellant's guilt.

### X. ARK. SUP. CT. R. 4-3(h)

Although appellant makes no certification that he has abstracted all objections decided adversely to him, the state does make such a certification. We have determined there are no such objections requiring reversal.

The judgment of conviction is reversed and the case remanded for a new trial.

BROWN, J., concurs.

HAYS, J., dissents.

ROBERT L. BROWN, Justice, concurring. I would reverse this case, but I would do so on the basis that the admission of Larry McGuire's testimony violated Young's privilege against self-incrimination — not on the basis of luminol testing.

Larry McGuire's testimony was important to the State and damaging to Young. McGuire testified that Young sold him a hunting dog which then turned up missing. Later, McGuire retrieved the dog from Jacobs's premises after the murder. The fact that McGuire's missing hunting dog had been sold by Young to Jacobs tied Young directly to Jacobs's murder. It also provided a motive for the murder. Saline County investigators without question were lead to McGuire by Young's statements after the

grant of immunity. When that immunity was revoked, evidence gleaned under the cloak of immunity was not admissible absent an independent source for the testimony or prejudice. An objection was made at trial by the defense to McGuire's testimony on that basis, and a hearing was conducted by the trial court in chambers. Neither an independent source for the McGuire testimony nor lack of prejudice was shown. Yet, the objection was overruled.

The trial court abused its discretion in not excluding McGuire's testimony, which to my way of thinking was clearly prejudicial. The fact that there was testimony from other dog owners does not minimize its grievous impact. Only McGuire testified that he bought a dog from Young which was then missing and ultimately found at Jacobs's farm. The other Missouri residents testified that Young returned the dogs to them. They had given the dogs to Young either to sell on consignment or for breeding purposes.

Reversal on the basis of the luminol testing is not warranted, however. There was testimony at Young's trial by Kenneth Thomas Trimble, who was also charged and tried for the murder of Jacobs, that Young had blood on his clothes from the victim and even got some blood on Trimble when they scuffled briefly after the killing. The two men wearing bloody clothing then got in the truck. Trimble testified that he bought new clothes at a Wal-Mart store because of the bloody condition of Young's clothes. That a substance found in the truck was initially screened for blood by luminol testing appears innocuous when Trimble's testimony is factored into the equation.

The majority writes that Trimble's credibility was at issue, and the luminol test might have tipped the balance in the jury's minds. But Trimble had already been convicted of Jacobs's murder by the time of Young's trial, and this fact was imparted to the jury on cross examination. Also, the fact that the luminol test was not conclusive for human blood, or even blood at all, was made clear to the jury by Dr. Whittle. Reversible error seems lacking under these circumstances. The luminol evidence was simply not sufficiently prejudicial to warrant a new trial.

STEELE HAYS, Justice, dissenting. I adopt by reference Jus-

tice Brown's analysis of the luminol issue and join in his opinion to that extent.

As to the testimony of Larry McGuire, I find no error in the admission of that evidence at trial. The trial court's ruling violated neither Rule 403 or 404(b) of the Arkansas Rules of Evidence, nor appellant's Due Process rights. Appellant relies on *Kastigar* v. *United States*, 406 U.S. 441 (1972) and *Murphy* v. *Waterfront Commission*, 378 U.S. 52 (1964). Neither is especially pertinent to this case. In *Kastigar*, a defendant had been granted immunity in a state court proceeding and the court held that in a federal proceeding the burden was on the prosecution to show that its evidence was obtained independently. Similarly, in *Murphy*, the petitioners had been granted immunity under state laws and they had refused to answer questions in a proceeding before the Waterfront Commission of New York Harbor on grounds that it would incriminate them under federal law. In their appeal from a civil contempt penalty the Supreme Court held that, absent an immunity provision, one jurisdiction may not compel a witness to give testimony which might incriminate him under the laws of another jurisdiction. Unlike the case before us, in neither of those had the defendant violated his agreement to give full and truthful information and testimony on which the immunity agreement was based. Appellant has cited nothing that would sustain the right to breach an immunity agreement by giving false statements and then object to the use of any information which was given.

The argument is comparable by analogy to *Ricketts* v. *Adamson*, 483 U.S. 1, 107 S.Ct. 2680, 97 L.Ed 2nd 1 (1987), where the Supreme Court held that a defendant charged with first degree murder who agreed to testify against co-defendants in exchange for a plea agreement to second degree murder was not protected by the Double Jeopardy Clause against reinstatement of the first degree murder charge when he reneged by refusing to testify against co-defendants in their retrial where such a consequence was part of the agreement.

As to Rule 403, the theft of Larry McGuire's dog was relevant to prove the plan of appellant and his accomplice which led to the murder of Raymond Jacobs. There was no abuse of discretion by the trial court in allowing this evidence.

I believe the judgment of conviction should be affirmed.